## PATRICK HAMMEL v. THOMAS FEIGH AND OTHERS.

## J. D. MAHONEY, AS SPECIAL ADMINISTRATOR OF THE ESTATE OF THOMAS FEIGH, DECEASED, APPELLANT.[1]

June 20, 1919.

No. 21,254.

**Partnership — parol contract as to tract of land.**

1. There may be a partnership in real estate formed by parol, notwithstanding the provisions of the statute of frauds requiring contracts

[1]Reported in 173 N. W. 570.

relative to interests in real estate to be in writing, and it may be limited to a designated tract of land.

**Partnership — statute of frauds — accounting after completion.**

2. The provision of the statute of frauds relative to agreements not to be performed within a year, if applicable to a contract of partnership such as found in this case, is not effective after the purposes of the partnership are accomplished, and an accounting in such a case will be had in accordance with the terms of the oral partnership agreement.

**Same — finding sustained by evidence.**

3. The evidence sustains a finding that there was a partnership by oral agreement between the plaintiff, Hammel, and Feigh, the original defendant, now deceased, in whose name title was taken, in a particular tract of land upon which a mine was developed.

**Same — not affected by registration of title.**

4. The registration of the land under the Torrens system made with the consent of the plaintiff and with the understanding that it should not affect his rights, did not affect them, and if there was a partnership in the property before registration there was afterwards.

**Misconduct of counsel — new trial.**

5. There was impropriety in the conduct of counsel for plaintiff in stating before the jury that he could prove certain facts which were wholly immaterial and of which proof was inadmissible. Whether a new trial should be granted for misconduct is largely within the discretion of the trial court. It is *held* that it was not error to refuse a new trial upon the ground of misconduct.

Action in the district court for Crow Wing county for a dissolution of partnership, an accounting between the parties and that plaintiff be decreed to be the owner of an undivided one-half interest in certain real estate. The case was tried before Stanton, J., who at the close of the testimony denied defendant's motion that the jury be directed to return a verdict in his favor and that the jury be directed to answer "No" to the question which follows, and a jury which answered "Yes" to the question: "Were the plaintiff and defendant Thomas Feigh partners as alleged in the complaint with reference to the lands specifically described in said complaint?" The judge made findings and ordered judgment in favor of plaintiff for $135,689.30. From an order denying his motion to amend the findings and for judgment in his favor notwithstanding the

verdict or for a new trial, J. D. Mahoney, as special administrator of defendant Feigh, appealed. Affirmed.

*Baldwin, Baldwin & Holmes, Albert Fink* and *George H. Sullivan,* for appellant.

*Fryberger, Fulton & Spear* and *A. T. Rock,* for respondent.

DIBELL, J.

Action for a partnership accounting.

The plaintiff, Patrick Hammel, claims that there was a partnership created by oral agreement between himself and the original defendant, Thomas Feigh, who died after the trial, covering certain land on the Cuyuna Range. The question whether there was such a partnership was submitted to a jury which found that there was. The court made findings for the plaintiff. The administrator of Feigh, J. D. Mahoney, substituted as defendant, appeals from the order denying the motion for a new trial.

1. An agreement by two parties to combine their money and efforts and skill and knowledge and purchase land for the purpose of reselling or dealing with it at a profit is a partnership agreement, or a joint adventure having in general the legal incidents of a partnership. The agreement may be oral without offending the statute of frauds relative to the creation or transfer of interests in land. The title may stand in one or in both. The agreement may relate to a designated tract or to lands generally. One may contribute all of the effort and skill and knowledge and the other all of the money, or they may contribute in such way as they choose, and the division of anticipated profits or possible losses may be upon such basis as the parties by their contract determine. These principles are stated over and over again and are applied to the varying facts of different cases. King v. Remington, 36 Minn. 15, 29 N. W. 352; Newell v. Cochran, 41 Minn. 374, 43 N. W. 84; Fountain v. Menard, 53 Minn. 443, 55 N. W. 601, 39 Am. St. 617; Baldwin v. Eddy, 64 Minn. 425, 67 N. W. 349; Stitt v. Rat Portage Lumber Co. 98 Minn. 52, 107 N. W. 824, 6 L.R.A.(N.S.) 191, 116 Am. St. 387; Church v. Odell, 100 Minn. 98, 110 N. W. 346; Irvine v. Campbell, 121 Minn. 192, 141 N. W. 108, Ann. Cas. 1914C, 689; Son-

nesyn v. Hawbaker, 127 Minn. 15, 148 N. W. 476; Kruse v. Tripp, 129 Minn. 252, 152 N. W. 538.

A sharing in profits does not necessarily make a partnership. Thus where two agree that. the one shall advance the money and the other buy land and care for it and when sold there shall be a division of net profits, the arrangement may amount to an employment and fixing of compensation and not to a partnership. Such a case was Davis v. Peterson, 59 Minn. 165, 60 N. W. 1007. And where one is in position to acquire title to property, and acquires it for another and in such other's name, under an agreement that he is to have an interest in the land, such an arrangement does not alone make a partnership or joint adventure, and it is unenforceable because of the statute of frauds. Such a case was Bennett v. Harrison, 115 Minn. 342, 132 N. W. 309, 37 L.R.A.(N.S.) 521. It is essential that there be a joint contribution to the enterprise and something in the nature of a community of interest in it and its results.

2. The defendant, citing Grand Forks Lumber Co. v. McClure Logging Co. 103 Minn. 471, 115 N. W. 406, contends that an oral partnership agreement is invalid within the statute of frauds referring to agreements not to be performed within one year, and that the one claimed between the plaintiff and the defendant was not to be performed within a year and was therefore invalid. G. S. 1913, § 6998. Without deciding the question suppose it be so. The property engaged in the enterprise or resulting from it is not lost nor destroyed because there is no writing. Neither partner can exclude the other from it because he happens to be in possession of it or because he has the legal title. Some of the cases suggest that a partnership within the statute is a partnership at will and what is voluntarily done under it is just as effective as if there were a writing. Wahl v. Barnum, 116 N. Y. 87, 22 N. E. 280, 5 L.R.A. 623; Sanger v. French, 157 N. Y. 213, 51 N. E. 979; 20 R. C. L. 811; Burdick, Part. 15; Gilmore, Part. 93; 1 Rowley, Part. § 212.

This is an action for an accounting. The parties, as is noted later, accomplished the main purpose of their partnership. They performed, or at least the plaintiff did. The contract of partnership is no longer executory and the statute is without application to the present situation.

Blake v. J. Neils Lumber Co. 111 Minn. 513, 127 N. W. 450, and cases cited.

3. The important question is whether there was a partnership by oral agreement between Hammel and Feigh of which the particular land was the subject matter. Hammel resided at Duluth and had considerable practical knowledge of the Cuyuna range and its mineral possibilities. He was without any considerable amount of money. Feigh, also residing at Duluth, was not familiar with the range, but had money and business sagacity. The two were intimate friends for many years and had many land transactions together. At the time of the trial in June, 1917, Hammel was 67 and Feigh 89 years of age.

On June 3, 1905, one Blackwood had an oral option whereby he could sell 320 acres or a little less of land on the Cuyuna range for $3,420, on which ten per cent earnest money must be paid immediately. Hammel procured this option from him. He then presented the matter to Feigh, and without much negotiation an understanding of some kind was reached. Feigh gave Hammel a check for $343 for the initial payment and it was so applied. Later, on June 21, he gave him a check for $3,077 with which to close. Afterwards he paid Hammel the expenses which he incurred in closing the deal, and it is claimed by him, but denied by Hammel, that he paid him a small sum besides for services. Hammel years ago was register of deeds of LeSueur county, had dealt considerably in lands, and had a serviceable knowledge of titles, and he saw to the title, and the execution of deeds, and the closing of the transaction. Title was taken in the name of Feigh.

Efforts were made almost immediately, through options given, to develop the property and some exploratory work was done. Some ore was discovered, but a working lease did not result immediately. Finally, after somewhat continued and prolonged negotiations with different people, an option was taken by the C. M. Hill Lumber Company, which resulted in a lease executed May 24, 1910. Under this lease or assignments and modifications of it a producing mine was developed and operated.

It is the claim of Hammel that his agreement with Feigh, as finally made, was that the Blackwood option should be closed; that Feigh should furnish the money; that he, Hammel, should attend to the closing of the

deal; that the land should be kept and handled jointly for profit through mineral development and not immediately sold; that they should share equally in the profits after Feigh was paid his investment in money; that there was a joint contribution to the undertaking and a community of interest, and that the agreement was in fact a partnership one.    Feigh denies it.

Some eight or nine witnesses testify that Feigh, on dates or occasions which they assume to fix, and generally eight to twelve years before, stated to them or in their presence in substance that Hammel had an interest in the property or was a partner.    Such testimony given after so long a lapse of time is necessarily subject to imperfections.    That given was admissible.    Some of it was bad.    The credibility and weight of it all were for the jury.

There is evidence that in the negotiations for a lease, commencing soon after the acquisition of the property, Hammel took an active part with Feigh.    Concededly he brought the property to Feigh.    If his testimony is true he got nothing and was to get nothing for his services.

From 1903 on Hammel and Feigh were concerned in some 20 or more land deals mostly in the Cuyuna region, though a few were in Duluth. Hammel had upwards of 50 in the Cuyuna region in which Feigh was not interested.    In some of the transactions in which the two were interested Hammel got a commission.    In some he obtained the right to sell at a fixed price and Feigh found a purchaser and there was a division of profits.    Sometimes an undivided interest in the land was sold for the full price at which he was authorized to sell so that an undivided interest in the land was acquired by way of profit.    In some the land was taken in Feigh's name and when sold there was a division of profits.    Usually quick turns were made.    These transactions indicate that Hammel and Feigh were working in harmony and that a sharing in profits was common.    They are not decisive in favor of one or the other.    They furnish a basis of argument for each upon the question of fact in issue.

Hammel's testimony is not always satisfactory.    Often it is uncertain and evasive of direct inquiry.    Sometimes he forgets.    Many times he is proved to be mistaken.    He does, though, cling to his claim of talks and doings with Feigh sufficient, if true, to constitute a partnership agreement.    Some things discredit him.

In June, 1905, he deposited Feigh's check for $3,077 in a Brainerd bank for the purpose of closing the deal and the deposit was checked out. Shortly before the trial he asked the bank to send him the checks and it seems rather certain that they were sent. He did not produce them at the trial. His excuse for not producing them is weak and his effort to charge one of counsel for the defendant with responsibility for their absence detracts in our view from his explanation. The defendant claimed that Hammel got a commission from Blackwood. These checks would have shown how the transaction of 1905 was closed. There was some other evidence that Hammel got a commission from Blackwood. If he did, that fact had a direct bearing upon the question whether there was a partnership with Feigh.

Hammel at one time applied to a Duluth bank for a loan and made a property statement which included his Cuyuna interests, but did not include the Feigh mine. At a time when the value of the mine was assured he sought a loan of $8,000 or $9,000 from Feigh and took a refusal without complaining. In May, 1911, when the mine was earning royalties, and when Feigh had received upwards of $13,000, which was many times his investment, Hammel testified as an expert in the Federal court at Duluth as to the value of Cuyuna lands. He testified to selling the lands to Feigh and stated that the only interest he had in Cuyuna property was a one-eighth interest in a mine then being developed. He spoke of the Feigh mine as "probably the largest on the range." His testimony was frank to the effect that he had not been fortunate in acquiring mining property on the range, seemed to evince a regret, but was not of a complaining character. Afterwards, and when his share of the accumulated royalties was something like $100,000, he sold some of his Cuyuna interests at a sacrifice and borrowed money on others of them. The land was conveyed to the Thomas Feigh Land Company, and registered in its name. Feigh had all the stock. No one connected with the transfer, unless it be Feigh, was apprised of Hammel's claim.

Hammel's long delay in asserting his rights is against him. The mine became a revenue producer in 1910. The minimum output the first year was 45,000 tons, and increased rapidly, and the royalty was 35 cents. Hammel made no demand of Feigh then or until about the beginning of

1914, though it is evident that he could have conveniently used a portion of the accrued royalties which belonged to him. He explains his delay by saying that he thought Feigh would finally comply with the partnership agreement, and further that he had consented that out of the first royalties Feigh might use certain sums for his church and charities in which he was much interested and in which he, Hammel, was in sympathy.

Both had the same church affiliations. From 1910 to 1916 Feigh did expend something like $90,000 in connection with his church or in charitable work. He built two or three small churches and started a home for cripples. He was himself a cripple. He seemed to get dissatisfied with his donations and results coming from them and they ceased. Suit was brought in November, 1916. At that time the accrued royalties exceeded $200,000. Hammel was even then a little reluctant about bringing suit.

Feigh claims that there was no partnership agreement. His many deals with Hammel in lands in the Cuyuna region he recounts from memory with considerable definiteness. His testimony is in direct denial of that of Hammel. He claims that Hammel was paid a small sum for his services in closing the deal. Sometimes he paid him small sums for services. Several witnesses testify to circumstances in his favor. One or more testify that Hammel said that Blackwood agreed to divide commissions with him but only gave him a small amount, and several that he said in substance that he had no interest in the land, but expected some day Feigh would give him something. Such testimony is subject in a measure to the infirmities attaching to that offered in behalf of Hammel of admissions of Feigh, though in general the witnesses were testifying to events of more recent occurrence.

The facts are such as well enough to justify the argument, and a finding, that there was no partnership, but that Hammel expected that he would be given something substantial if the property turned out well. The argument is forcefully made that what with Hammel was originally a hope of a gratuity became upon much thinking over it a promise of a reward, which finally emerged in a definite claim of partnership right, but such argument is one on a question of fact. And the argument is well enough made that Feigh and Hammel really formed a partnership; that Feigh intended to carry it out; that if there had been a sale soon at

a moderate profit he would have done so and the profits would have been divided, but that when the property, after many years of working and waiting, became very valuable, and when he was weakened by ill health and advancing years, and was perhaps under the influence of relatives, he decided that he would keep it all regardless of Hammel's rights, or that he perhaps got in a mental condition where he believed that the property was his of right and that Hammel's claim was without merit. This, too, is an argument on a question of fact.

It is difficult to gather from the record the characteristics of litigants, but there is much to indicate that Feigh was in some respects peculiar but of marked vigor and shrewdness; that he was somewhat close in his dealings, and of considerable skill in accumulating property, and that he was, when angered, stubborn and unyielding. Hammel was apparently easy-going, rather careless of his deals, perhaps generously inclined, not particularly thrifty, and surely not self-assertive if his story be a true one.

As we read the record there is no ground for ascribing to Feigh all the bad qualities which the plaintiff's brief attaches to him. Aside from this one transaction in which the finding is against him, Feigh was surely enough a good and much used friend of Hammel for many years, and Hammel helped Feigh too.

We have read all of the evidence and the exhaustive briefs of counsel. A complete review of the evidence is impossible within the proper limits of the opinion nor would it be useful. That which we have made is imperfect. We have not stated all the claims of the parties as to evidentiary facts nor the explanations given by Hammel of many occurrences to which reference is made. It is not to be supposed that the jury believed everything that was told. It had the two men before it and took their measure and determined the considerations that affected them and the probability of the stories they and other witnesses told and the explanations they gave. Likely it sifted the evidence and rejected the incredible and drew proper inferences. The question whether there was a partnership was submitted fairly in a charge to which there was no objection, and the finding of the jury, approved by the trial court, is final.

4. On December 1, 1909, Feigh conveyed the land to the Thomas Feigh Land Company, a corporation organized to take it. Upon Febru-

ary 17, 1912, the land was registered under the Torrens law. Hammel was not made a party to the registration. He knew of it. The court finds that he acquiesced in it, that it was understood between him and Feigh that it would not affect the partnership transaction or his rights, and that the registration was in furtherance of the partnership business.

It is claimed that the decree of registration bars the plaintiff. We are unable to see it so. The court's finding that the decree was entered under an understanding between Hammel and Feigh is sustained. He was not a party to the proceeding. If there was a partnership in the property before there was a partnership after the registration decree. If it were not so a partnership having among its assets land of record in the name of one of them would lose it if it were registered in his name. This holding does not trench upon the well recognized theory that a Torrens decree creates an indefeasible title and is not merely evidence of title. Henry v. White, 123 Minn. 182, 143 N. W. 324, L.R.A. 1916D, 4; Baart v. Martin, 99 Minn. 197, 108 N. W. 945, 116 Am. St. 394; State v. Westfall, 85 Minn. 437, 89 N. W. 175, 57 L.R.A. 297, 89 Am. St. 571.

No rights of innocent purchasers are involved. It is not necessary to invoke the provision of G. S. 1913, § 6918, relative to registrations procured by fraud. After the registration the land was deeded to Feigh. If there was a copartnership between him and Hammel in this land before the deed to the company and the registration there was when the title again came to him.

5. One ground of the motion for a new trial is misconduct of counsel for the plaintiff resulting in prejudice to the defendant. The misconduct claimed can be stated shortly.

Upon the cross-examination of one of the plaintiff's witnesses he volunteered a remark to the effect that it was common talk about Duluth that Feigh was "throwing" Hammel. To some extent counsel for the defendant cross-examined upon this remark. Another witness for the plaintiff on cross-examination was interrogated by counsel for the defendant about such rumors. Some two days later counsel for the plaintiff, as a part of his main case, asked one of his witnesses as to the common report on the streets of Duluth about Feigh "throwing" Hammel. What transpired in this immediate connection is best shown by letting the record speak:

By Mr. Fryberger:

Q. Mr. Klippen, what is the common report on the streets of Duluth and has been common report for the last three or four years about old man Feigh throwing his partner, Pat Hammel, in this mining deal?

Mr. Baldwin: Object to that as irrelevant and immaterial.

The Court: Objection sustained.

Mr. Fryberger: All right. They won't let us go into it.

Mr. Baldwin: You knew you could not go into it. You knew it was improper.

Mr. Fryberger: Well, you went into it with two witnesses.

Mr. Baldwin: What is that?

Mr. Fryberger: I can bring plenty of witnesses if you will let me go into it, to show that.

Mr. Baldwin: I will ask the court to instruct the jury that that was an improper remark and to disregard it.

The Court: It was an improper remark.

Mr. Baldwin: And we take an exception to it.

Mr. Fryberger: I beg pardon of the court if it was improper.

We engage in no discussion and cite no authorities whether the conduct of counsel in thus pressing the matter was improper. It was. The trial court said so. It is not supposable that anyone connected with the trial thought that the issue as to partnership could be tried by inquiring what street rumors in Duluth were. A new trial upon the ground of misconduct is not granted as a disciplinary measure but because injustice has been done. Smith v. Great Northern Ry. Co. 133 Minn. 192, 158 N. W. 46, and cases cited. Whether one shall be granted is largely in the discretion of the trial court. Smith v. Great Northern Ry. Co. 133 Minn. 192, 158 N. W. 46, and cases cited; Wadman v. Trout Lake Lumber Co. 130 Minn. 80, 153 N. W. 269; Wells v. Moses, 87 Minn. 432, 92 N. W. 334. The trial court exercised its discretion upon the motion for a new trial. It knew much better than we the importance or lack of importance of the incident. It found that there was no misconduct requiring a new trial. We pass this feature of the case with the remark that we cannot say from the record that it was error to deny a new trial upon the ground of misconduct.

We see nothing in the claim of a bar by the statute of limitations or

by laches requiring discussion. All of the points discussed in the briefs have had consideration and we find nothing requiring further mention.

Order affirmed.