C. J. McRAE v. THOMAS M. FEIGH AND ANOTHER.

J. D. MAHONEY, AS SPECIAL ADMINISTRATOR, APPELLANT.[1]

July 11, 1919.

No. 21,286.

APPEAL OF DEFENDANT MAHONEY.

**Broker — findings supported by evidence.**

1. The findings of the trial court that the owners of a tract of land, containing deposits of iron ore, employed plaintiff to procure a purchaser who would take an option for a lease on certain prescribed terms, and promised plaintiff as compensation whatever amount he obtained as a royalty over 25 cents per ton; that plaintiff procured a purchaser ready to take an option for a lease at a royalty of 30 cents per ton; that the owners refused to execute this contract solely for the reason that plaintiff claimed the excess royalty of five cents per ton; that thereafter the owners made a new agreement with plaintiff, by which, in case the property was leased, plaintiff was to have any excess of royalty over 30 cents per ton, and was to have this excess even if the property was leased by the owners without plaintiff's aid, is sustained by the evidence.

**Variance.**

2. There was not sufficient difference between the contract proved and the contract alleged to constitute a fatal variance.

**Limitation of action — laches.**

3. The cause of action was not barred by the statute of limitations, nor by the laches of defendant.

**Statute of frauds.**

4. Enforcement of the contract is not inhibited by the statute of frauds, as it was performable within one year and was actually consummated within that period.

**Contract — consideration — uncertainty.**

5. The relinquishment of plaintiff's claim under the prior contract and his acts under the present contract constitute a valid consideration, and the contract is not void for want of mutuality. Neither is it void for indefiniteness and uncertainty.

[1]Reported in 173 N. W. 655.

APPEAL OF PLAINTIFF.

**Receiver — appointment not warranted.**

Plaintiff sought the appointment of a receiver to collect and pay to him his share of the royalties which should accrue in the future, and appealed from an order denying a new trial of this issue. *Held* that the facts shown did not entitle plaintiff to such relief.

Action in the district court for St. Louis county against Thomas M. Feigh and Patrick Hammel, copartners doing business under the name of Thomas Feigh, to recover $41,438.29 and to have a receiver appointed to collect future royalties over and above 30 cents per ton upon all ore removed from the premises described in the complaint. Upon the death of Thomas Feigh, J. Daniel Mahoney, special administrator of his estate, was substituted defendant. The facts are stated in the opinion. The case was tried before Fesler, J., who at the close of the testimony denied defendants' motion for a directed verdict, submitted to the jury the three questions mentioned in the opinion on page 244, and ordered judgment in favor of plaintiff for the amount demanded. Plaintiff's motion for amended findings or for a new trial was denied. From an order denying defendant Feigh's motion to amend the findings and order judgment for defendant notwithstanding the verdict or for a new trial, J. Daniel Mahoney, as special administrator of the estate of Thomas Feigh, deceased, appealed. From an order denying his motion for a new trial, plaintiff appealed. Affirmed on both appeals.

*Fryberger, Fulton & Spear* and *A. T. Rock,* for plaintiff.

*A. L. Agatin* and *Albert Fink,* for the special administrator.

TAYLOR, C.

In 1905, defendant Feigh became the owner of a tract of land in Crow Wing county on which an iron mine was subsequently developed. The land was purchased through defendant Hammel, and a claim made by Hammel to an interest in the property was determined in his favor in the case of Hammel v. Feigh, supra, page 115, 173 N. W. 570; in which the decision of this court was filed on June 20, 1919.

After it became known that the land contained deposits of iron ore, Feigh desired to find a purchaser for the ore who would take a lease of

the property and mine the ore on a royalty basis. It appears from the findings of fact that in 1907 Feigh promised to pay plaintiff $500 if plaintiff procured a purchaser who took an option for such a lease at a royalty of 25 cents per ton on certain prescribed conditions, and $5,000 if such purchaser exercised the option and actually took a lease; that under this agreement plaintiff opened negotiations with the representative of an iron company, but did not succeed in closing a contract, and later opened negotiations with another iron company which were progressing favorably, but were terminated because Feigh gave an option for a lease to another party; that thereafter plaintiff made a new agreement with Feigh, by which instead of a cash commission he was to have whatever amount he secured as a royalty over and above 25 cents per ton; that acting under this agreement he induced E. C. Hollidge to agree to take an option for a lease at 30 cents per ton; that after the contract had been drawn up and had been approved as to form by the attorneys of both parties, Feigh refused to sign it because he was unwilling to allow plaintiff five cents per ton of the royalty; that thereafter and on or about July 1, 1909, plaintiff made another agreement with Feigh by which he was given the exclusive right to lease the property and by which "said defendants agreed to give plaintiff all they got over and above thirty cents a ton in case plaintiff secured a lessee and that if defendants themselves leased the property without the aid of plaintiff they would give plaintiff everything they got over thirty cents a ton;" that acting under this agreement plaintiff again tried to find a party who would take an option for a lease; that on August 24, 1909, Feigh made a contract with the C. M. Hill Lumber Company, by which that company took an option for a lease at a royalty of 35 cents per ton payable quarterly on the twentieth day of each January, April, July and October while the lease remained in force; that after doing some exploratory work this company exercised its option, and on May 24, 1910, took the lease of the property under and in accordance with the contract; that the mine has been developed and is still being operated under this lease as changed and modified by the parties; that Feigh has been paid 35 cents per ton for all ore taken from the property; that he received the first of these payments on July 20, 1910, and has received

a payment on every succeeding quarter day, and that he refused to pay to plaintiff any part of the amount so received.

On October 1, 1917, plaintiff commenced this action to recover one-seventh of each payment already received by Feigh under the lease, and to have a receiver appointed to collect the future royalties, or for such other equitable relief as would secure the payment to plaintiff of his share of such future royalties as they accrued.

Feigh interposed a separate answer, in which he admitted leasing the property to the C. M. Hill Lumber Company and the payment of royalties by that company as claimed by plaintiff, admitted that in 1908 he had agreed to pay plaintiff $5,000, if plaintiff effected a lease of the property at 30 cents per ton, admitted that he refused to sign the Hollidge lease because plaintiff claimed all of the royalty above 25 cents per ton, and denied the other claims of plaintiff.

Defendant Hammel interposed a separate answer in which he asserted ownership of a half interest in the mine, and admitted that Feigh, acting for both of them, had made the contract with plaintiff as alleged by plaintiff, and that plaintiff was entitled to five cents per ton of the royalty received under the lease made by Feigh.

The action was tried as an action in equity, but the court submitted the following three questions to a jury:

(1) Did the defendants agree with plaintiff to give plaintiff an exclusive option to lease the property?

(2) Did the defendants agree with plaintiff to give plaintiff all they got over and above thirty cents a ton in case the plaintiff secured a lessee?

(3) Did the defendants agree with the plaintiff that if defendants themselves leased the property without the aid of plaintiff they would give plaintiff everything they got over and above thirty cents a ton?

To each of these questions the jury answered "yes." The court made full findings of fact which accord with the findings of the jury and directed judgment in favor of plaintiff for plaintiff's share of the royalties already received by Feigh, but made no provision for securing plaintiff's share of royalties which may be paid in the future. Feigh moved to set aside the verdict, and to amend the findings and for a

judgment in his favor, or for a new trial. While these motions were pending Feigh died and Daniel Mahoney, as special administrator of his estate, was substituted as defendant in his place and stead. These motions were denied and the special administrator appealed.

## APPEAL OF DEFENDANT MAHONEY.

1. The court found as a fact that plaintiff was not the procuring cause of the lease made by Feigh with the C. M. Hill Lumber Company, and hence plaintiff's claim to the amount by which the royalty exceeded 30 cents per ton rests upon the agreement found both by the jury and by the court that plaintiff should receive such excess even if the lease was made by Feigh himself without plaintiff's assistance. Appellant attacks this finding as unsupported by the evidence. Plaintiff and Hammel testified to the effect that such was the agreement. Feigh denied it. Appellant urges various considerations as discrediting the testimony of plaintiff and Hammel, and justifying its rejection. The extent to which a witness is to be believed and the weight to be given to his testimony are for the jury and the trial court to determine. If they had found that no such agreement had been made, the arguments advanced by appellant and the authorities cited by him would be in point to sustain such finding. But both the jury and the trial court found that such an agreement had, in fact, been made, and, as the evidence on the part of plaintiff, if believed, is sufficient to justify this finding, the finding must stand.

2. Appellant contends that there is a fatal variance between the allegations of the complaint and the proof. This contention seems to be based mainly on the fact that plaintiff failed to prove the allegation that he was the procuring cause of the lease to the Hill Company and the claim that the allegations of the complaint are not broad enough to permit plaintiff to prove an agreement to give him all of the royalty above 30 cents per ton in case defendants leased the property without his assistance. The complaint alleges:

"That thereupon said defendants agreed with this plaintiff that in view of what he had already done upon said property and in consideration of the same, that they would give this plaintiff the exclusive right

to secure a party willing to take an option for a lease upon said property * * * that if said lease should be taken that plaintiff should receive from defendants for his said services, whatever he would get for them over and above a royalty of 30 cents per ton * * * that defendants themselves should not interfere with plaintiff's leasing said property by themselves giving option to other parties, as had occurred before, and that if said defendants should themselves option said property during the refusal given to this plaintiff, that the same should not affect the right of this plaintiff to his said compensations, but that he should, in like manner, receive as pay for his services said excess above said royalty of 30 cents per ton upon the ore to be removed from said property."

Under our statutes pleadings are construed liberally, and a variance is not fatal unless the pleading alleged a cause of action different from that proven, or actually misled the adverse party. 2 Dunnell, Minn. Dig. §§ 7672, 7673, 7674. There was no such variance between the contract alleged and the contract proved as to mislead the defendants.

3. The court found that "plaintiff is not guilty of laches in the bringing of this action." Appellant attacks this finding as not justified by the evidence. The first royalty was paid July 20, 1910. Feigh removed from the state of Minnesota to Chicago, Illinois, in April, 1916, and consequently no part of plaintiff's claim is barred by the statute of limitations. G. S. 1913, § 7708. At the time plaintiff brought this action he could have maintained a suit at law on the contract to recover his share of each of the payments theretofore received by Feigh. A court of equity will not bar a claim, enforceable in an action at law, for a delay of less than the statutory period, at least, unless it be shown that the enforcement of the claim will result in substantial injury to innocent parties. See 2 Dunnell, Minn. Dig. § 5351.

4. Appellant contends that plaintiff's contract was not to be performed within one year and is within the statute of frauds and unenforceable for that reason. The statute provides that no action shall be maintained on an agreement resting in parole "that by its terms is not to be performed within one year from the making thereof." G. S. 1913, § 6998.

In Langan v. Iverson, 78 Minn. 299, 80 N. W. 1051, it is stated:

"That statute applies only to contracts which are not to be performed upon either side within a year. If all that is to be performed on one side is to be performed within a year, the contract is not within the statute."

In Stitt v. Rat Portage Lumber Co. 98 Minn. 52, 107 N. W. 824, it is stated: "The statute of frauds has no application where the contract could be performed within the year, nor where it runs for an indefinite time."

In Taylor v. Times Newspaper Co. 83 Minn. 523, 86 N. W. 760, 85 Am. St. 473, it is stated: "Contracts held void under the first subdivision of G. S. 1894, § 4209 [G. S. 1913, § 6998], are such only as cannot, by their terms, be performed within a year."

In Kruse v. Tripp, 129 Minn. 252, 259, 152 N. W. 538, which involved some elements similar to some of those in the instant case, it is stated:

"The agreement was entered into on May 26, and, though not in writing, the final act in consummation of the relation was the royalty contract with the Pine Tree Co., and that was entered into in the month of October following. It was fully performed within a year by plaintiff, through the conveyance of the land to the railway company, and defendant is in no position to invoke the statute, if it can be said to be applicable at all."

The contract here in question fixed no definite time within which it was to be performed. It contained no provision postponing performance beyond a year and cannot be construed as contemplating any such postponement. It could be fully performed within a year. The royalty contract with the lumber company was made within the year. The act of the defendants in making this contract relieved plaintiff from all duty of further performance under his contract, as nothing remained for him to do. Plaintiff's contract was fully consummated within the year and is not within the statute.

5. Appellant contends that the contract is unilateral and without consideration, also that it is too indefinite and uncertain to be enforced. As the findings are in favor of plaintiff, in considering the questions presented we must take the view of the evidence most favorable to plaintiff.

Under his original contract plaintiff interested an iron company in

the property to such an extent that they expressed a willingness to take an option for a lease. When he reported this proposition to Feigh, he was informed that a contract could not be made at that time, as an option given by Feigh to a third party was still outstanding. Feigh suggested that he drag the negotiations along until this option terminated He refused to do so and informed the iron company of the outstanding option, whereupon they abandoned the negotiations. Under the new agreement made after the option given by Feigh had expired, plaintiff induced Hollidge to take an option for a lease at a royalty of 30 cents per ton. All the terms of both option and lease were agreed upon and were embodied in an elaborate written instrument covering 14 printed pages of the record, drawn by the attorney for Hollidge and approved by the attorney for Feigh. After this contract had been prepared ready for execution, Feigh refused to sign it, solely for the reason that plaintiff claimed five cents per ton of the royalty. After this deal fell through because of Feigh's refusal to complete it and after more or less controversy between plaintiff and Feigh, they made the agreement now in dispute. The prior transactions between them were taken into consideration by both parties in making this agreement. It superseded the prior agreements, and operated as a relinquishment on plaintiff's part of any claim for damages growing out of Feigh's failure to carry out such prior agreements. Under this last agreement, plaintiff suggested to two different parties interested in the iron business the matter of taking an option for a lease, but did not succeed in interesting them in the project. He had a talk at Deerwood with a mining engineer connected with the C. M. Hill Lumber Company concerning a lease to that company, and returned to Duluth the next day, where he learned that that company had already made a contract directly with Feigh. The foregoing facts show a sufficient consideration for plaintiff's contract and it is not void for want of mutuality. Lapham v. Flint, 86 Minn. 376, 90 N. W. 780.

Appellant insists that "the contract is too indefinite and uncertain to be capable of enforcement." The indefiniteness and uncertainty which appellant urges as voiding the contract are not as to the terms of the contract between plaintiff and Feigh, but as to the terms to be embodied in the contract between Feigh and the lessee if a lessee were ob-

tained. The taking of options for leases, with an obligation to explore for ore while holding the option, has been common on the iron ranges for many years, and the general nature and customary provisions of such contracts are well known to those engaged in that sort of business. The several agreements between plaintiff and Feigh specified the rate per ton which any lessee procured by plaintiff would be required to pay Feigh as a royalty, and specified for each year the minimum quantity of ore on which he would be required to pay the royalty, even if he mined a less quantity or none at all in such year. As was common in such transactions, other terms and details, not specifically stated and usually not the subject of much controversy where the parties came to an agreement in respect to the royalties and the minimums, were left to be settled and agreed upon at the time of drawing the formal contract. There has been no controversy at any time over these terms. No question was raised concerning them when plaintiff interested an iron company in the property under his first agreement. They were specified fully and in detail in the proposed Hollidge contract, and, as embodied therein, were agreed to by both parties without dispute. Except as to the amount of royalty and the amount of minimums, the same terms contained in the Hollidge contract were incorporated in substance in the contract with the C. M. Hill Lumber Company under which the mine is now being operated. So far as any uncertainty existed as to the terms, it was cured and the terms were made certain when the formal contract was executed. The lease having been actually effected on terms satisfactory to Feigh, he is not in position to complain that some of these terms were not expressly specified in his agreement with plaintiff at the time it was first made. Hubachek v. Hazzard, 83 Minn. 437, 86 N. W. 426.

We find no other questions raised by the appeal of the administrator which require special mention and the order denying Feigh's motion for a new trial is affirmed.

## APPEAL OF PLAINTIFF.

The court declined to appoint a receiver or make other provision for the collection of plaintiff's share of the future royalties, but on plain-

tiff's motion amended its findings by setting forth therein the material facts on which plaintiff bases his claim for such equitable relief. Plaintiff made a motion for a new trial of this issue and appealed from the order denying his motion.

Plaintiff's claim that the court should appoint a receiver or make some other provision for the collection and payment of his share of the future royalties, is based on the assumption that defendants and their successors in interest will refuse to make these payments as they become due, and that plaintiff will be compelled to resort to the courts in order to collect them. He calls attention to the fact that these payments may extend over a period of 40 years; that Feigh had died and left numerous heirs scattered through several states and the Dominion of Canada; that Hammel is well along in years and his interest may pass to nonresidents, and argues that bringing suit against all these parties for the several payments as they accrue, if not impracticable, will be so burdensome that the court under its equitable powers ought to provide for the payment of his share of the royalty directly to him or to a receiver for him.

The controversy, heretofore, has been as to whether plaintiff is entitled to the excess royalty of five cents per ton. Feigh asserted that it did not belong to plaintiff and refused to give it to him for that reason. This controversy is now settled and plaintiff's right to the excess established. The previous refusals to make payment were based on a denial of the obligation. Now that the obligation is established, we cannot assume that defendants or their successors in interest will refuse to perform it henceforth. If they do, the mine is within the jurisdiction of the court, and their interest therein can be subjected to the payment of plaintiff's claims, and the court can take such action as may be necessary for the adequate protection and enforcement of plaintiff's rights. But we concur in the conclusion of the trial court that no sufficient reason is yet shown for the court, in effect, to take charge of the collection and distribution of the future royalties.

The order appealed from by plaintiff as well as the order appealed from by the special administrator of the estate of Thomas Feigh is affirmed.