LYLE J. POWELL v. STANDARD OIL COMPANY AND OTHERS.[1]

July 16, 1926.

No. 25,368.

**Verdict sustained by evidence.**
1. Evidence examined and found to sustain the verdict. The record fails to show misconduct of a juror.

**Mere objection to argument of counsel to jury presents nothing for review.**
2. In the absence of a request for a ruling, a mere objection to remarks of counsel to jury in the argument does not present their effect for review upon appeal.

**Verdict not excessive.**
3. The damages awarded are not excessive.

**Rulings on admission of evidence.**
4. There was no prejudicial error in the rulings upon the admissibility of evidence.

Appeal and Error, 3 C. J. p. 891 n. 24; 4 C. J. p. 837 n. 89; p. 906 n. 44; p. 969 n. 56.
Damages, 17 C. J. p. 1119 n. 28.
Explosives, 25 C. J. p. 209 n. 98.

See note in L. R. A. 1915F, 30; 8 R. C. L. p. 274; 2 R. C. L. Supp. p. 638; 4 R. C. L. Supp. p. 567; 5 R. C. L. Supp. p. 480.

Action in the district court for Washington county to recover damages for personal injuries. The case was tried before Stolberg, J., and a jury which returned a verdict in favor of plaintiff. Defendants appealed from an order denying their motion for a new trial on condition plaintiff consented to a reduction of the verdict. Affirmed.

*Orr, Stark & Kidder*, for appellants.
*Reuben G. Thoreen* and *Sullivan & Neumeier*, for respondent.

[1]Reported in 210 N. W. 55.

QUINN, J.

Action to recover damages for personal injuries alleged to have been occasioned by the negligence of the defendant Standard Oil Company and its agent in placing gasolene and kerosene in plaintiff's tank upon his farm. There was a verdict of $30,000 in favor of plaintiff. Upon motion for a new trial, an order was made setting aside the verdict unless plaintiff consent to a reduction thereof to $25,000 in which case the motion was denied. The consent was filed and defendants appealed.

The appeal does not raise the question of defendants' negligence, yet a recital of some of the facts as disclosed by the evidence will be of assistance in considering the amount of damages.

Respondent was 34 years of age, married, had two children, lived upon a dairy farm about three miles out from Stillwater, kept 24 cows, hired but little help, doing nearly all of his own work. He used a great deal of kerosene and gasolene and for about five years had purchased all that he used from the defendant Standard Oil Company. His house faced east. There were three rooms down and three upstairs. The living room was in the southeast corner; the hall and stairway in the northeast corner; the dining room in the southwest corner, and the kitchen in the northwest corner. The latter was 13 feet square with an 8 foot ceiling. The garage was about 100 feet southwest of the house in which was a 55-gallon capacity steel drum, painted red. There was a 30-gallon capacity steel drum painted a blue gray a short distance northeast from the garage in which kerosene was kept.

On November 18, 1924, respondent requested the Standard Oil Company to fill his tanks with gasolene and kerosene. Mr. Thomas who usually made all deliveries to respondent was on a vacation and Mr. Jacobson for the first time made the delivery to respondent on the following morning. The truck tank had three compartments, one for kerosene holding 200 gallons, and two for gasolene of different grades. There was a separate faucet for each compartment. The kerosene compartment had been emptied on the afternoon of November 18. After refilling it, Jacobson drove to Madden's grocery

store and delivered 100 gallons of kerosene. When he went to respondent's place, Powell pointed out the gasolene and kerosene drums and Jacobson proceeded to fill them from the truck tanks by use of a red five-gallon can. He delivered what purported to be 60 gallons of gasolene, putting 55 gallons in the red drum and 5 gallons in a truck which stood in the yard. He put what purported to be 20 gallons of kerosene in the 30-gallon drum which stood outside of the garage.

No oil was used from the kerosene drum until December 5, when respondent drew off 5 gallons and put it in his kerosene tractor tank. The tractor started easily and worked unusually well. At about 9 o'clock on the evening of that day, respondent filled a two-gallon can from the kerosene drum, went to the kitchen, filled his lantern, set it down near the kitchen door and placed the can on the floor near the reservoir at the end of the stove. The can had an opening at the top one inch in diameter and the cap was gone. It also had an open spout a little larger than a lead pencil. He then shut the doors to the kitchen and went to bed. It was his habit to rise early, light a fire in the kitchen stove and set about doing his chores before breakfast.

On the morning in question, he arose at 5:30 o'clock. It had snowed during the night. He was partly dressed, having on shirt, trousers and stockings but no shoes. He came downstairs, went through the living room, struck a parlor match on the top of the stove and a terrific explosion followed setting on fire his clothes, the furniture in the kitchen, and spreading through the lower rooms and to the top of the stairway. He was dazed, ran into the hallway and called to his wife and children. The heat was so intense and the smoke so thick they were unable to go down. Respondent went to the front door in an attempt to get out but found it locked and went back to the dining room in an attempt to get out through the kitchen door. He got onto the porch but because of the smoke could not find his way out. At this time the hired man broke a window, unlatched the door, helped respondent out into the snow and there extinguished the fire in his clothing. They then procured

a ladder and helped Mrs. Powell and the children out. Neighbors came quickly and took respondent to the hospital arriving there between 6 and 7 o'clock. Dr. Kalinoff was summoned and responded before 7 o'clock.

It appears from the uncontroverted testimony that, during the evening prior to the accident, a hot fire was had in the range; that .the reservoir was full of water; that the kitchen was warm; that the fire went out about 7 o'clock; that a few sticks of wood were placed in the stove at that time; that after the explosion the lids of the stove were in proper place and the wood undisturbed; that, as the result of the explosion, a large amount of plastering was knocked off the ceiling and the can containing the kerosene was torn to pieces. It also appears that a sample of the fluid taken from the 30 gallon drum was about 20 per cent gasolene. However it was charged upon the trial that the brothers of respondent placed gasolene in the drum for the purpose of making a case against the defendants. There was no proof offered in support of such charge but it is evident that the accusation caused some pretty sharp thrusts between counsel.

Dr. Kalinoff testified that he graduated in medicine and surgery from the Michigan University in 1901; that he had been in general practice at Stillwater for 23 years; that he had known plaintiff for 10 years; that he was called on the morning of December 6th and went to the hospital between 6 and 7; that when he first saw plaintiff he did not recognize him; that he was badly burned; that in some places the burns were third degree, some second degree and some first degree; that by first degree is meant a slight burn where the skin will repair itself and leave no scar; that second degree is where the skin is burned, will repair itself but leave a scar; that third degree is where the skin is entirely destroyed and possibly the flesh is burned so that in healing there .will be a great scar left; that he dressed plaintiff's burns, covering them with salve, gave patient opiates to relieve him from pain; that his whole face, head, eyes, ears, hair, neck, the arms to the elbow, hands, fingers, the feet to about four inches above the ankle, above and below the

knees, and on the knees were covered with bandages; that some of his finger nails and toe nails were burned entirely off and some came off later; that he treated plaintiff until February, dressed him twice a day by removing the old and applying new dressings; that during the process of changing, while the flesh was exposed to the air, it was very painful; that during the first three or four weeks there was a great deal of sloughing, that is, the part which was burned gradually dying away, little by little; that around the fingers, ears, forehead and nose the burns were of the third degree; that the arms, feet and legs were of the second degree; that the skin on the bottom of his feet all came off about a quarter of an inch thick; that the patient was in a delirious state during the first three weeks; that he saw him once or twice every day; that when he talked with him he apparently answered questions and knew what he was saying but could not remember; that he was in a stupor like, not able to comprehend, due to the absorption of poison from the burns; that the burned, rotten flesh was absorbed into the system which intoxicated him, causing poison just like using alcohol or any other intoxicating liquors; that it absorbed into the blood through the entire body and to the brain; that this condition continued more or less during the first three weeks; that it was his opinion that the injuries around the ankles, arms, forehead, ears and nose were permanent; that the rim of his ears, tip of his nose were entirely burned off and the mucous membrane, the covering or lining of the nose, was entirely destroyed; that the other scars will remain and possibly contract and show more; that a normal skin has not formed on his ankles; that a permanent scar remains and is going to bother him forever and the circulation is poor; that he is doubtful whether plaintiff will ever be able to wear leather shoes; that the effect of the scars on his ankles and arms impairs his strength about 25 per cent; that he will not be able to do farm work as he did before; that he does not think plaintiff's strength will ever be normal again; that he suffered a mental, nervous shock which will be lasting, probably the balance of his life, and that his ability to resist is impaired.

Dr. T. C. Clark testified that he had practiced medicine and surgery in Minnesota during the past 44 years; that he had known

plaintiff since childhood; that he examined him on May 18, 1925; that in his opinion plaintiff's injuries were of a permanent character insofar as the second and third degrees are concerned; that he is permanently incapacitated for farm work; that he will never be able to be on his feet for any great length of time but may be able to walk better than he does now, but won't be able to walk long distances or even moderate distances; that the injuries have advanced his age so that he is an older man now than he would have been in years and has less nervous force. In other respects, the doctor corroborated the testimony of Dr. Kalinoff.

Anna Bjoren testified that she was a graduate nurse, cared for the plaintiff over a month while he was in the hospital and assisted in dressing his burns. She further testified in corroboration of the testimony of Dr. Kalinoff.

The plaintiff testified in his own behalf. After corroborating the testimony of Dr. Kalinoff as to his burns and the treatment thereof, he testified that he was in the hospital about eight weeks; that a portion of his finger nails were burned completely off at the time he entered the hospital and that the balance came off afterwards; that he suffered pain so intense most of the time while in the hospital that he could hardly endure it; that since, his feet are tender and tire out quickly; that he is nervous; that a little noise startles him and that he has been unable to do any work; that he has exercised every day a little but is not able to exercise very much; that he has been improving some but does not sleep well nights.

A number of medical experts gave their opinion as to the permanency of plaintiff's injuries to the effect that he would gradually improve and be able to resume work.

Prior to his injury, plaintiff was a strong, healthy man, 34 years of age. He was earning about $150 per month in addition to the use of the farm building and such produce as naturally enters into one's living on a farm. He had been engaged in farming and dairying all his life. The evidence tends to show that his ability to carry on such business was permanently impaired. As the result of the explosion and fire, he lost personal property, incurred expenses

such as doctor and hospital bills in caring for himself and in loss of time, aggregating an amount in excess of $2,000.

No complaint is made of the instructions of the trial court in submitting the question of damages. In its instructions the court told the jury that the plaintiff was entitled to recover nothing beyond a fair and adequate compensation. The jury returned a verdict in favor of the plaintiff in the sum of $30,000 which was reduced by the trial court to $25,000. Having in mind the greatly diminished purchasing power of a dollar as compared with what it was but a few years ago, we think the amount of the verdict was not so excessive as to indicate passion or prejudice on the part of the jury, and that the amount should not be interfered with by this court. In view of the fact that a rather full statement of facts has been set forth, a further mention thereof is unnecessary.

The holdings in the following cases are pertinent: Hillstrom v. Mannheimer Bros. 146 Minn. 202, 178 N. W. 881; Strand v. G. N. Ry. Co. 101 Minn. 85, 111 N. W. 958, 112 N. W. 987. It will be observed that the latter case was decided in May, 1907, before the depreciation of the purchasing power of a dollar. While the verdict there was $30,000 and was reduced to $20,000, yet, as it remained, the purchasing power thereof was much greater than in the instant case. In Elder v. C. R. I. & P. Ry. Co. 163 Minn. 457, 204 N. W. 557, where the verdict was substantially $30,000 and held not excessive, plaintiff was 38 years of age and was earning $240 per month.

It is claimed that a lady juror at the close of the trial "proceeded directly from her seat in the jury box to Mrs. Lyle Powell who was sitting in the court room in front of the railing and crying at the time and proceeded to hold a conversation with her for some little time * * * and comfort her." If this charge stood undenied or the record disclosed that it was established as a fact it would of course command serious consideration. But this question was raised on the motion for a new trial and affidavits for and against the accusation presented a question of fact which was determined by the trial court against the contention of appellant. We do not find any justification for interfering with that finding.

Appellants assign misconduct of counsel for plaintiff, resulting in prejudice to defendants, as a reason why a new trial should be granted. A new trial is not granted because of misconduct of counsel as a disciplinary measure but because of prejudice resulting therefrom, if it does so result. Whether a new trial should be granted upon that ground rests largely in the discretion of the trial court. Smith v. G. N. Ry. Co. 133 Minn. 192, 158 N. W. 46, and cases cited; Wadman v. Trout Lake Lbr. Co. 130 Minn. 80, 153 N. W. 269; Wells v. Moses, 87 Minn. 432, 92 N. W. 334; Hammel v. Feigh, 143 Minn. 115-125, 173 N. W. 570.

Both the arguments made by counsel on behalf of plaintiff and of defendant were taken by the reporter and are printed in the record. Both arguments might have been materially shortened and the jury quite as well informed as to the issues which it was to determine. Defendant assigns as reasons for a new trial many statements made to the jury by counsel for plaintiff but we search the record in vain for any proper exceptions thereto. It is well established in this state that, to raise the point that counsel for the prevailing party was guilty of prejudicial misconduct in his argument to the jury, objection should be made and the court's attention called to the statement so there may be an opportunity to correct its prejudicial effect by appropriate action at the time. Mullen v. Devenney, 149 Minn. 251, 183 N. W. 350; Wadman v. Trout Lake Lbr. Co. supra; State v. Frelinghuysen, 43 Minn. 265, 45 N. W. 432; Langdon v. M. St. Ry. Co. 120 Minn. 6, 138 N. W. 790; Mykleby v. C. St. P. M. & O. Ry. Co. 49 Minn. 457, 52 N. W. 213; Corrigan v. Elsinger, 81 Minn. 42, 83 N. W. 492; Schultz v. Schneckenberger, 81 Minn. 380, 84 N. W. 119.

This case emphasizes the importance of the trial court and counsel co-operating and meeting such emergencies as may arise when there is alleged misconduct of counsel in his argument to the jury. It is the duty of counsel to point out the prejudicial language used at the time and it is the duty of the trial court to see to it that the record properly shows what language was in fact used and to have that language entered upon the record at that time as its finding as to what was said. In this case however there is no dispute or

controversy as to what was in fact said. The record discloses the language used but the deficiency arises from the fact that appellant's counsel did not exact a ruling from the trial court in the way of an admonition to the jury to disregard the language. This was the duty of counsel. State v. Frelinghuysen, 43 Minn. 265, 45 N. W. 432; Mykleby v. C. St. P. M. & O. Ry. Co. 49 Minn. 457, 52 N. W. 213; Mullen v. Devenney, 149 Minn. 251, 183 N. W. 350. Had the request been made it would have been the duty of the trial court to act.

In Wadman v. Trout Lake Lbr. Co. supra, it was said:

"We might dispose of this instance of alleged misconduct also by saying that objection to it was not presented or raised in the proper manner. No ruling * * * was asked of the court on the trial and no exception taken to any act or ruling or omission of the court. The proper practice in such cases is well settled."

The general fairness of the trial court is shown in its rulings throughout the trial. Appellants not having requested any action or asked any instruction are not in a position to urge error on account of the court's failure so to do.

The serious part of counsel's argument to the jury had reference to plaintiff as a poor man. As he neared the close of his argument, counsel said:

"And now my friends the moment has come when this case is going to you and you are going to accept it and the responsibility for this verdict and all, and it seems to me that in this great case where Lyle Powell, unknown, poor, walks into this courtroom, faced with all the might of the Standard Oil Company, with all the circumstances that you have heard in this case, that a verdict can be [rendered], and I believe it will be [rendered] when you return here, which will stand as a monument in the records of this court forever to the effect that a poor and lowly man may come into a Washington County court before a Washington County jury and obtain justice even against the Standard Oil Company."

Prior to the making of such statements to the jury, counsel said:

"I am not going to stand before this jury and point out this great Standard Oil Company as an object that you should assail. I think the Standard Oil Company is just as much entitled to your [calm] and considerate judgment in this case as the plaintiff is, and Lyle Powell asks nothing else. He doesn't come before you to make any parade of any kind, to ask you to render a verdict which will issue from your emotions or your sympathy. If he can get justice, and I am sure he can, before this jury, that is all he asks. Justice. What you think is right. What your consciences tell you is right. That is what Powell is entitled to, nothing more. * * * Consider this matter upon the evidence in this case, upon the injuries received by the plaintiff, upon the question of the liability of the defendant, as fairly as you can, and render us a judgment that will be based upon your judgment of what is right from all the evidence. That is what we want. Lyle Powell asks no charity from anybody in the world. Lyle Powell comes before the court and this jury invoking right, invoking justice and there is an abiding consciousness in him and in me that we will get a verdict which will represent your ideas of justice and righteousness and with that, whatever it is, we shall be content."

Appellant also complains of the argument of plaintiff's counsel wherein he said:

"And Lyle Powell and Mrs. Powell, wan and weary, will wait. They will wait, they will be waiting that verdict and you will be in there deliberating and as you deliberate, remember Lyle Powell as he looks, see him waiting there with Mrs. Powell and those children, waiting your judgment, a judgment which will either place them, leave them forever in want and poverty, or will place them where they will not have to seek charity from any man but will live upon the righteous verdict of twelve wonderful men and women."

Defendants' counsel requested the trial court, in writing, to instruct the jury to "entirely put aside any feeling of sympathy which may naturally be aroused by the injuries he received or the argu-

ment of counsel." The request was granted. The court of its own motion and without any request from defendants, further instructed the jury:

"It is the duty of this jury to decide this case from the evidence and you should not be swerved from that duty by any consideration of sympathy for any party nor for any prejudice against any party to this action. The case must be decided fairly and squarely upon the proof given here in court and upon nothing else."

At the conclusion of the charge, the court said: "Is there anything that counsel has in mind?" Following this statement from the court, both counsel for plaintiff and for defendants suggested certain instructions apparently inadvertently omitted by the court, but no suggestion was made by counsel for an instruction in relation to the language used by counsel in his argument. Other statements made by counsel for plaintiff are assigned as error but we are satisfied from a careful reading of the entire record that a fair trial was had and that the jury was not prejudiced by the statements of counsel complained of so as to demand a new trial.

We do not think any prejudice resulted to defendants from the acts complained of as misconduct of the jurors, nor do we find any substantial error in the rulings upon the admissibility of evidence.

Affirmed.


STONE, J. (concurring in result.)

I concur in the result in deference to the cited precedents. But I cannot refrain from expressing the view that, as applied here, they go altogether too far in requiring counsel "to exact a ruling" from the court whenever misconduct of an adversary is claimed. That practice relieves the trial judge of too much of the responsibility which is his, and correspondingly imposes upon counsel a duty which is not theirs. It is theirs to make timely complaint of misconduct. It is not theirs, I submit, to compel a ruling on their complaint.