RUBY M. HARRIS v. BREEZY POINT LODGE, INC.[1]

January 23, 1953.

No. 35,813.

---

[1]Reported in 56 N. W. (2d) 655.

*Sexton, Tyrrell & Jardine,* for appellant.
*Carl E. Erickson* and *S. G. Fitzpatrick,* for respondent.

CHRISTIANSON, JUSTICE.

Defendant appeals from an order denying its alternative motion for judgment notwithstanding the jury's verdict or for a new trial in a personal injury action.

Defendant, Breezy Point Lodge, Inc., operates a resort on Big Pelican Lake in Crow Wing county. In connection with its resort defendant maintains a stable to furnish riding horses for its patrons on an hourly rental basis. It also offers instruction in riding to its patrons who desire to take it. In early August of 1950 plaintiff, Ruby M. Harris, was a patron at defendant's resort and arranged

with Ford Torkelson, an employe of defendant who was in charge of the stables, to take riding instruction during her stay at Breezy Point. During the five-day period preceding August 6, 1950, Torkelson had given plaintiff an hour of instruction each day. On all but the first day she had ridden a horse named Duke. On the afternoon of August 6, Torkelson again assigned Duke to her for further riding instruction. Duke was owned by Torkelson but was used by defendant at its stables, Torkelson and defendant sharing profits on a fifty-fifty basis. During the afternoon's ride, as Torkelson, plaintiff, and Torkelson's assistant were riding along a road running near the stable, Duke veered toward the stable, ran into a car parked beside the road, and raised up on his hind legs. Plaintiff fell from the horse and was injured. She brought action against defendant, Breezy Point Lodge, Inc., to recover damages for her injuries. The trial court submitted two theories of negligence to the jury for consideration:

(1) Did the horse, Duke, have a disposition or propensity to balk and rear up, did defendant have notice of such disposition, and, if so, was defendant negligent in giving that horse to plaintiff considering defendant's knowledge of the extent of her riding experience?

(2) Did defendant's employe, Torkelson, at the time of or leading up to the accident, conduct himself negligently and thereby cause the horse, Duke, to act in such a manner that plaintiff was thrown from him?

The jury returned a verdict in plaintiff's favor for the sum of $28,000.

Several of defendant's assignments of error turn upon the question whether there was evidence sufficient to support a verdict for plaintiff on the two theories of negligence submitted to the jury. The two questions of law raised thereby will be considered separately and in the order in which the issues of negligence were submitted by the trial court. In considering these questions we, of

course, must view the evidence in the light most favorable to plaintiff.

■ There was evidence from which the jury could have found that on several occasions, when Duke's former owner and members of his family had tried to bridle Duke, the horse had developed a wild look, had become unmanageable and uncontrollable, and had reared up and run away; that others had similar trouble trying to bridle Duke; that one time Duke had reared up and fallen over backward, causing a rider to fall from his back; and that Duke was stubborn, balky, and unsafe for inexperienced riders. The jury could further have found from the evidence that the person who sold Duke to Torkelson had informed him that Duke was not safe for inexperienced riders and had been traded by a former owner, who lived only a short distance from Breezy Point, because his children could not handle Duke; that, before Duke was sold to Torkelson, Torkelson assured the seller he would ride the horse himself and use him to lead trail; that plaintiff was an inexperienced rider and was relying upon Torkelson's judgment when she agreed to ride Duke; and that she had informed Torkelson of her inexperience and reliance. From the above evidence the jury could properly have found that Duke had tendencies toward stubbornness and balkiness which made him dangerous to a rider of plaintiff's limited experience; that defendant, through its agent, Torkelson, had knowledge of plaintiff's inexperience and also had notice of Duke's dangerous characteristics, or at least such notice as would have made a prudent man inquire further into Duke's nature before permitting a rider of plaintiff's limited experience to ride him; and that defendant was therefore negligent in permitting plaintiff to ride Duke.

We have found no case in this state involving the hiring out of an allegedly dangerous horse by a riding stable. This court, however, has often decided the question of what notice of vicious tendencies one who keeps an allegedly vicious animal must have before he will be held liable to one injured by the animal. The rule in such cases is that he is negligent if he neglects to act so as to prevent the risk of damage when he has such notice of the vicious propensities

as would put a prudent man on his guard.[2] Many cases, some decided on a theory of breach of implied warranty rather than tort, adopt a stricter rule with regard to one who hires out a horse for riding than to one who keeps a vicious animal. These cases place a duty upon one who hires out a horse to make a reasonable effort to ascertain whether the horse has dangerous tendencies even though there are no circumstances which would warn a reasonable man that the horse may be dangerous.[3] In other words, the mere fact that he knows he is going to hire out the horse for riding requires that he assure himself, at least insofar as he can do so by reasonable inquiry, that the horse is fit for that purpose. However, for the purposes of this decision, we need go no further than the rule applied by this court in the "vicious animal" cases previously cited, because there was evidence here that defendant, through Torkelson, had notice of certain tendencies that might make Duke dangerous to an inexperienced rider and the jury could have found that such notice would have put a prudent man on guard.

There was also evidence from which the jury could have found that during the ride Duke swerved, and headed straight toward a parked car and that, despite plaintiff's efforts to rein him out, he ran into or sideswiped the back end of the car and reared up, causing plaintiff to fall from his back and sustain injuries. From such evidence it could properly have found that it was a manifestation of Duke's dangerous tendencies which caused the accident and, therefore, that defendant's negligence in permitting plaintiff to ride Duke was the proximate cause of her injuries. We find, therefore, sufficient evidence to support a verdict for plaintiff on the first theory of negligence submitted to the jury.

[2]Hagerty v. Radle, 228 Minn. 487, 37 N. W. (2d) 819; Lee v. Seekins, 208 Minn. 546, 294 N. W. 842; Cuney v. Campbell, 76 Minn. 59, 78 N. W. 878; Fake v. Addicks, 45 Minn. 37, 47 N. W. 450.

[3]Lynch v. Richardson, 163 Mass. 160, 39 N. E. 801; Evans v. Upmier, 235 Iowa 35, 16 N. W. (2d) 6; Conn v. Hunsberger, 224 Pa. 154, 73 A. 324, 25 L.R.A.(N.S.) 372; Dam v. Lake Aliso Riding School, 6 Cal. (2d) 395, 57 P. (2d) 1315; Kersten v. Young, 52 Cal. App. (2d) 1, 125 P. (2d) 501; Vaningan v. Mueller, 208 Wis. 527, 243 N. W. 419.

■ Examining the events leading up to the accident in the light most favorable to plaintiff, they appear as follows:

Previous to the day of the accident Torkelson had asked plaintiff to ride around the front of the lodge to make people aware of the riding facilities at the resort, but she had refused. On the day of the accident Torkelson asked her again, but plaintiff questioned her capability in view of her limited experience and the large crowd that would be there. Torkelson assured her that she was capable, and she then agreed. With Lewis, Torkelson's assistant, in the lead and Torkelson and plaintiff following in single file, the three riders went down in front of the lodge and then over a hard-surfaced road leading around to the stables. They were riding slowly, and the trip was completed without incident. At Torkelson's request plaintiff agreed to a second trip, and they proceeded around again in the same order. As they were going by the lodge the second time, Torkelson began to call to plaintiff's horse and told her to kick him in the side to make him go faster, but plaintiff refused because she did not want to ride faster. They were on a downgrade, and Torkelson had never before let her ride downhill faster than a walk. As they turned and headed uphill along the road which led past the stable, plaintiff was second in line, with Torkelson in the rear continuing to call, "Duke, come on." The horses' hoofs made such a clatter on the hard-surfaced road that the noise attracted the attention of several persons, who turned toward the riders and witnessed the accident and the events immediately preceding it. The horses were traveling fast, and plaintiff had to concentrate all her attention on remaining on the horse. Torkelson was waving his arms and flailing his horse, urging him on, and he continued to yell, "Duke, get up there," in a loud and angry voice. Duke moved rapidly toward the car, and plaintiff was unable to rein him out. After the accident Torkelson told plaintiff that he would not have had it happen for anything in the world, he had simply overjudged her riding ability.

Keeping in mind that the jury might have found Torkelson had, or should have had, knowledge of Duke's dangerous tendencies and

knew of plaintiff's inexperience, we cannot say that the foregoing evidence was insufficient to support a finding that Torkelson conducted himself negligently and thereby caused Duke to act in such a manner that plaintiff was injured.

■ Defendant assigns as error the admission of testimony of witnesses Theodore Krueger, Harold Carroll, and Max Slocum concerning their observations of the characteristics and nature of the horse, Duke. Defendant's objection to the testimony of each witness was substantially the same, namely, that it was immaterial and without foundation since it had not been shown that the information had been conveyed to defendant. The trial court overruled the objections, stating that plaintiff might first show the condition of the horse and then show that defendant had notice of it. Many plaintiffs in actions like this have had verdicts in their favor reversed because they failed to offer evidence that the horse had dangerous tendencies.[4] Since proof of the horse's dangerous tendencies is a necessary element of a successful action, admission of evidence concerning such tendencies was not error. Cf. Rowe v. Ehrmanntraut, 92 Minn. 17, 99 N. W. 211; Hagerty v. Radle, 228 Minn. 487, 37 N. W. (2d) 819. Nor was it error to admit evidence of dangerous tendencies before it was shown that defendant had, or should have had, knowledge of them, especially where the trial court specifically required that the evidence of such tendencies be followed by evidence of defendant's knowledge.

■ Defendant also assigns as error the trial court's permitting defendant's employe, Torkelson, to be questioned concerning use of an English saddle for plaintiff's riding instruction and further the court's permitting plaintiff's counsel to comment on the matter in his closing argument. It is sufficient to say that the use of an English saddle was one of the circumstances in the light of which the conduct of Torkelson and the danger to plaintiff from Duke's

---

[4]Troop A Riding Academy v. Miller, 127 Ohio St. 545, 189 N. E. 647; Clifton v. Holliday, 85 Ohio App. 229, 88 N. E. (2d) 304; O'Donnell v. Holdorf, 304 Ill. App. 442, 26 N. E. (2d) 653; see, Cooper v. Layson Brothers, 14 Ga. App. 134, 80 S. E. 666.

allegedly dangerous tendencies were to be judged. No claim was made that it was negligence in itself for defendant to have permitted plaintiff to use an English saddle.

■ Defendant further contends that three acts of plaintiff's counsel constituted prejudicial misconduct entitling defendant to a new trial. It asserts that there was misconduct in the following part of plaintiff's counsel's closing argument:

"* * * We have had to talk about [Duke and agents of the lodge] * * *. But the lawsuit is against Breezy Point Lodge. And in that connection, and thinking now of answering some of Mr. Sexton's [attorney for defendant] statements, I would also raise the question: Where in this lawsuit did we find Mr. Jack Salenger, the president of Breezy Point Lodge, Inc., and the general manager? He wasn't here. He had some knowledge about the facts in this case. Where was Miss Lemon, the so-called nurse. She had facts. She wasn't here. And so I say to Mr. Sexton in the first place, there is no evidence in the case to the effect that I visited Mr. Anderson, but I still say to him, that it was for defendant to have Mr. Anderson in court."

Defendant contends that the reference to Mr. Salenger was "obviously designed and intended to inject racial prejudice into the case." Nothing appears from the printed record to support this contention.

Plaintiff's counsel asked a witness whether he had on numerous occasions smelled liquor on Torkelson's breath. Defendant's objection to the question was sustained, and plaintiff's counsel dropped the matter. He asked similar questions of two other witnesses. Each time an objection was sustained, and the matter was pursued no further. Defendant asserts that it was misconduct for plaintiff's counsel to persist, after an objection had been sustained, in asking the question of other witnesses. No authority need be cited to support defendant's assertion that it was improper for counsel to press the matter. It clearly was. However, a new trial upon the ground of misconduct is not granted as a disciplinary measure but because

injustice has been done. Whether one shall be granted is largely discretionary with the trial court. Hammel v. Feigh, 143 Minn. 115, 173 N. W. 570; see, Smith v. G. N. Ry. Co. 133 Minn. 192, 158 N. W. 46. The trial court, which was better able than we to judge the effect of the incident, exercised its discretion by denying a new trial. It found no misconduct so prejudicial as to require a new trial, and we cannot say from the record that it erred.

Defendant also contends that the following argument made by plaintiff's counsel constituted prejudicial misconduct:

"* * * And, as I say, she is a normal woman, single, who has the right to expect to be married some day and to carry on the activities that are normally carried on in a marriage relationship. Some of these things in life may be completely lost to her by reason of the accident, by reason of the negligence of Breezy Point Lodge. So I say it is an extremely serious thing to her, and it is a matter of magnitude, and I feel confident that every one of you believes that a substantial sum is necessary to compensate her for her injuries."

It should be noted that interference with plaintiff's prospective married life was only one of a series of results of the accident suggested by counsel and that the last sentence, beginning, "So I say that it is an extremely serious thing to her," must be read in context as referring to all of the suggested results and not as stressing the one now challenged. Defendant's objection to this argument is that it is not a proper inference to be drawn from the evidence. Defendant cites the testimony of plaintiff's doctor that the irregularity in the menstrual cycle from which plaintiff suffered ordinarily is not permanent. However, plaintiff continued to suffer from that condition at the time of trial, and, in view of her slow recovery up to that time, it was not improper to infer that the condition would last for some time into the future, even though it would not be permanent. Plaintiff was 36 years of age and was thus approaching an age when childbearing, a most important part of married life, is often no longer possible. Moreover, her injuries so restricted her

activities as to make a normal social life impossible. Although somewhat speculative, it would not be entirely unreasonable to infer that an extended period of very limited social activity would interfere with the opportunities of a single woman of plaintiff's age to marry and thereafter achieve a normal married life. We cannot say that the argument of counsel was so far lacking in evidentiary support as to require a new trial.

■ Finally, defendant contends that the verdict was so excessive as to require a new trial. Full consideration of such contention requires a rather extended review of the evidence concerning plaintiff's injuries.

Before her injury plaintiff was an active woman of 35 years. She had graduated from a school of nursing in 1936 and had gone on to higher education at other institutions, receiving a fellowship at St. Louis University where she majored in nursing education. She practiced nursing while taking such advanced work and continued to practice nursing until September 1949. At that time she obtained work as field representative for a publishing company in its nursing education department. Her work consisted of traveling by train, plane, or bus over an eleven-state area and visiting directors, educational directors, and instructors at schools of nursing. She discussed their publicity with them, tried to interest them in adopting her company's textbooks, and looked for authors for books to be published in the future. She was also expected to interpret changing trends in the methods of teaching nursing so that her company could prepare for future needs. She had to remain on the road continually, except for short periods of time, and needed two heavy suitcases to carry her clothing and necessary literature and sample texts. She often attended nurses' conventions and meetings to which she took large exhibits. She estimated that her annual salary and commissions amounted to $5,000.

Plaintiff suffered fractures of the second, third, fourth, and fifth transverse processes of the lumbar vertebrae. The second transverse process was displaced about one-third of an inch, the third was displaced two-thirds to three-fourths of an inch, the fourth was dis-

placed three-fourths of an inch, and the fifth was displaced only slightly. At the time of the trial, more than five months after the injury occurred, plaintiff's doctor was of the opinion that bony union would be complete so far as the second and fifth processes are concerned but would never exist so far as the third and fourth are concerned. He stated, however, that lack of bony union is a condition which, by itself, has no bearing upon disability. The injury which causes disability and excruciating pain is the tearing of the soft muscle and nerve tissue adjacent to the injured bone. It is the amount of damage done to that tissue which determines the subsequent course of the injury. Based upon the severity and duration of the symptoms in plaintiff's case, her doctor was of the opinion that damage to her soft tissue was more severe than is ordinarily seen in cases of the same type.

There was evidence that plaintiff was unconscious for a short time after falling from the horse; that, despite plaintiff's protests that she felt her back was injured, a nurse in the employ of defendant pulled her to her feet and made her walk; that the nurse encouraged plaintiff to remount Duke and, when she was unable to lift her foot into the stirrup, Torkelson lifted her bodily into the saddle; that after a short ride she regained sufficient will power to demand they return to the stable where she had to be lifted down from the horse; that, over plaintiff's continuing protests, the nurse encouraged her to walk back to her cottage unaided; and that she required aid to get up the step and onto the bed, where she lay in great pain until she was placed on a stretcher and driven to town for X rays. Finding her in great pain, the doctor, after completing the X rays, gave her a sedative and ordered her taken to a Brainerd hospital. The doctor was of the opinion that the additional riding and walking after the injury aggravated the amount of separation of tissue.

Plaintiff was hospitalized for over three months, 20 days in Brainerd and for 77 days at Fort Scott, Kansas, near her home. During that time she was in casts for about six weeks. The first cast was applied 10 days after the accident while plaintiff was pain-

fully suspended face downward between two tables for about 30 minutes, her head and arms resting on one table and her lower legs on the other. Because she lost weight, a second cast had to be applied after she arrived at the Kansas hospital. After each cast was applied she had to remain on her back in bed for two days while it hardened.

When plaintiff first arrived at the Brainerd hospital, she had to remain flat in bed and was in great pain from her shoulders down into her lower extremities. The injury caused paralysis of plaintiff's bowel, and she was nauseated and vomited many times a day for several days, during which time she could not even keep ice chips down and thus had to be fed intravenously. After application of the first cast, and to a lesser extent after the application of the second, severe pain returned and the vomiting began again.

Although the casts caused body soreness and increased the pain when plaintiff attempted to lift her legs, they did make it possible for her to change position and eventually to walk, at first only a few steps with aid, finally somewhat longer distances unaided. While at the Kansas hospital, she was started on mild exercises to strengthen the supporting muscles of her back but resulting muscle spasms forced her to discontinue them. After the cast was removed, plaintiff, at her doctor's direction, attempted to climb steps with the aid of a nurse. She climbed three steps on two successive days and developed severe muscle spasms which forced her to remain at bed rest for a week, receiving hypodermic injections for pain. Other effects of plaintiff's injury were dizziness during her stay at the Kansas hospital and irregularity in her menstrual cycle. Unquestionably plaintiff suffered great pain as a result of her injuries, sometimes so severe that she was required to remain at bed rest. The pain was felt not only in the area of the injury but, because of irritation of the nerve root at the spine, was felt in her legs as well, although they were not injured.

Plaintiff was still suffering from her injuries at the time of the trial. Even then she could climb no more than nine steps and had to be carried into the courtroom in a chair. She stated that she

still had a dull, heavy ache in the lower lumbar region extending down into her leg and that the pain became greater when she attempted to bend or otherwise increase her activities. She had discontinued the inductothermy treatments, which had been given her while she was at the Kansas hospital, but continued to apply heat by means of an electric heating pad as had been suggested by her doctor. Her menstrual cycle was still disturbed, although her doctor testified that such irregularity is ordinarily not permanent. He also testified that at the time of the trial plaintiff could bend toward the left but not toward the right and could bend forward only 45 or 50 degrees and that she was not permitted to lift things. He was of the opinion that, if plaintiff were up walking around or sitting up for only limited times and if she avoided bending, she would not have severe pain but would nevertheless have a mild dull ache; that only if she had a job which she could carry on under those circumstances could she work at that time; and that she could not return to her job with the publishing company for at least six months. The five-month period which had elapsed between the accident and the trial was insufficient for the doctor to give a definite opinion as to the permanence of plaintiff's injury. Plaintiff's medical and hospital expenses up to the time of trial totaled $1,502.54.

The $28,000 verdict awarded plaintiff is liberal. It approaches the border line between liberality and excessiveness. However, there was evidence to sustain a finding of special damages in the sum of $6,500. In addition to the large amount of special damages, we have evidence of a serious back injury, of severe and prolonged pain, and of a long period of hospitalization and restricted movement. Moreover, at the time of the trial plaintiff was still far from complete recovery. There never will be bony union of the fractures of the transverse processes of the third and fourth vertebrae. This condition is permanent. It is true that the evidence did not show with sufficient certainty that permanent disability would result, yet it was obvious from plaintiff's condition at the time of trial that she would suffer pain and disability for some time into the future, and it was proper for the jury to consider that fact. Finally, we cannot

ignore the fact that the verdict was approved by an experienced trial judge who had heard the evidence and had seen plaintiff's condition at the trial. Under all these circumstances we cannot say the verdict was so excessive as to require a new trial.

It follows that the order appealed from should be affirmed.

Affirmed.

MR. JUSTICE ROGER L. DELL, not having been a member of the court at the time of the argument and submission, took no part in the consideration or decision of this case.

