## FLORENCE NELSON v. TWIN CITY MOTOR BUS COMPANY.[1]

May 8, 1953.

No. 35,938.

*Ray G. Moonan, Charles Alan Wright,* and *Frank X. Cronan,* for appellant.

*Bryngelson, Pratt & Bradley,* for respondent.

[1]Reported in 58 N. W. (2d) 561.

MATSON, JUSTICE.

Defendant appeals from an order denying a motion for judgment notwithstanding the verdict or for a new trial. On this appeal liability is admitted and the only relief sought is a new trial on the issue of damages on the ground that the damages awarded by the jury are excessive and not sustained by the evidence.

On October 23, 1947, the plaintiff, Florence Nelson, was riding on a bus operated by the defendant. As she was leaving the bus at a bus stop in the city of Minneapolis, the door closed and caught plaintiff between the shoulders; the bus started and dragged her a few feet; then the bus stopped, the doors opened, and plaintiff fell to the pavement. She was helped to her apartment and put to bed by her daughter, Estelle, who had been riding on the bus with her mother. The next day plaintiff's physician, Dr. Edgar W. Bedford, diagnosed her injuries as "a sprain of the lower back * * * discolorations and contusions of both feet * * * severe sprain with discoloration of the right shoulder; and * * * a slight sprain of the left shoulder."

Shortly after the accident, on November 5, 1947, X rays were taken of plaintiff's right shoulder and spine. These X rays disclosed some arthritis in the lower spine and the presence of osteoporosis—a disease involving decalcification of the bones—in the pelvic bones, the hips, the spine, and in the acromioclavicular joint of the right shoulder. This osteoporosis was minimal in amount and existed prior to the date of the accident. According to medical experts it is possible to have a mild form of this disease and not have any pain or discomfort resulting therefrom, and the evidence stands unchallenged that the presence of the disease had not affected plaintiff's everyday life prior to the accident. In fact, during that period of her life antedating the accident, plaintiff had been a very active woman. She played the piano well, did all of her own housework, often went to movies and various social events, and generally was in good health. Since the accident she has been unable, at any time, to engage in any of these activities. She has had to be assisted in and out of automobiles, helped up steps, given her baths

in bed, and even assisted in walking on level surfaces. Although it appeared for a while that plaintiff would fully recover from the effects of the accident, she took a turn for the worse and has found it increasingly difficult, due to the pain attending her injuries received in the accident, to remain active. As a consequence, she became bedridden in March 1950 and has been confined to her bed ever since. All of the medical testimony is to the effect that she is totally and permanently disabled with little or no chance for improvement. She is now entirely dependent on others for everything that happens—being able to eat, having bowel movements, having her bed changed, and whatever else might be required for human life. The immediate cause of plaintiff's condition is the disease of osteoporosis, but all the medical experts agreed that the disease is aggravated and the degree of its seriousness accelerated by inactivity and immobility, and there is abundant medical testimony that the pain from the injuries suffered in the accident caused the inactivity which led to plaintiff's present condition.

The record contains much additional evidence relating to plaintiff's physical condition between the dates of the accident and trial. A series of X rays taken on December 3, 1949, less than three months before plaintiff became bedridden, show a slight compression frac ture of the 12th dorsal vertebra and a fracture involving the 9th rib on the left side. Although neither of these sections of the anatomy were X-rayed in 1947, experts testified that in 1949 these were "old fractures" and one gave his opinion that the fractures occurred at the time of the accident. A third set of X rays taken on January 19, 1952, two days before trial, shows another compression fracture of the first lumbar vertebra which was not present in either of the first two series of X rays. A possible explanation is that, as osteoporosis progresses due to inactivity, ordinary movements of the body may cause slight fractures of the demineralized and weakened bones, and the fracture of the lumbar vertebra probably was caused in this manner.

In addition to X rays, medical examinations conducted by three different doctors immediately preceding the day of trial disclose

almost identical findings. Plaintiff has a "marked frozen shoulder" or fibrositis on the right side so that she has practically no motion in the right shoulder joint. The examinations also showed that plaintiff's right elbow is almost as immovable, that her right hand has a permanent contracture so that the fingers are flexed and she is unable to extend them, and that she has very limited movement in her right knee. There is ample medical testimony that the accident caused the present condition of the right shoulder, elbow, hand, and knee. One expert stated that he he had seen only "very few" cases of a "frozen shoulder" without history of a previous accident or injury, and another never had seen such a case during his long career.

Ever since March 1950 when she was first confined to her bed, plaintiff has at various times and hours of the day had a practical nurse, and when the nurse is not in attendance plaintiff's daughter, Estelle, performs the necessary nursing services. The need for such services will no doubt continue for the remainder of the plaintiff's natural life. The reasonable cost for nursing services is about one dollar an hour. As of her 71st birthday on August 23, 1951, plaintiff was shown to have a life expectancy of 8.52 years. The jury gave plaintiff a verdict of $26,544.50.

Defendant assigns as error that the amount of damages awarded is excessive and not supported by the evidence. The gist of its argument is that the size of the verdict conclusively shows that the jury applied a wrong rule of damages to this case. Defendant admits that the court's instruction on the measure of damages was correct when the court informed the jury that they should allow damages only for "aggravation" of the pre-existing disease *caused by the injuries received in the accident.* Defendant contends, however, that the judge should have added the "qualification" that under the law damages could be allowed only for any "additional injury" caused by defendant's negligence and that this omission resulted in the jury allowing damages for those injuries attributable to the pre-existing condition of osteoporosis as well as those caused by the accident.

Despite defendant's contention, a careful consideration of the trial court's instruction can only lead to the conclusion that it was technically correct. In the interest of desirable clarity, however, it may be conceded that it would have been better to have explicitly pointed out to the jury that, where a pre-existing disease is aggravated by the negligence of another person, the victim's recovery in damages is limited to the additional injury caused by this aggravation over and above the consequences which the pre-existing disease, running its normal course, would itself have caused if there had been no aggravation by negligent injury.

Aside from the fact that strictly speaking the court's charge was correct, defendant's contention is also out of order because the instruction as given became the law of the case when the defendant failed to make an objection to it at the time it was given and made no assignment thereof in the notice of motion for a new trial. It is not to be overlooked that, for the purposes of an appeal from an order denying a motion for a new trial, a trial court's charge to the jury becomes the law of the case notwithstanding errors of fundamental law or controlling principle found therein which are not assigned in a motion for a new trial, and likewise as to unintentional misstatements and verbal errors or omissions to which no objection (with a recital of the grounds therefor) is made *before the jury retires* to consider its verdict.[2]

■ In the light of the evidence there is no indication that the amount of the verdict is excessive either as the result of an application of an incorrect rule of damages or as a reflection of passion and prejudice. It is true that all of the medical experts agreed that osteoporosis is generally a progressive disease and that it is, as appellant contends, conceivable that plaintiff's pre-existing disease could have, through a normal progression, caused her present condition. Admittedly there is testimony that permanent disability

---

[2]Ellingboe v. Guerin, 228 Minn. 211, 36 N. W. (2d) 598; Knutson v. Lambert, 235 Minn. 328, 51 N. W. (2d) 580; see, Rules 59.01(6) and 51 of Rules of Civil Procedure; 1 Dunnell, Dig. (3 ed.) § 404; MacIllravie v. St. Barnabas Hospital, 231 Minn. 384, 43 N. W. (2d) 221.

may follow within four or five years after one first becomes afflicted with osteoporosis, but this bit of testimony is not necessarily inconsistent with a finding that the normal progression of the disease would here have caused no permanent disability during plaintiff's normal life span.

The jury could reasonably find that, absent any aggravation by accidental injury, the disease would not have progressed beyond the stage it had reached in 1947. One medical expert testified that osteoporosis is not a condition that develops rapidly. *Another said that in his opinion plaintiff's present disability is based entirely upon the accident.* Several of the doctors testified that a person may have a limb afflicted with osteoporosis and still have a good motion of that limb and keep the disease from developing further if he keeps the limb active. It is significant that at the time of the trial plaintiff's left arm and shoulder, *which were not seriously injured in the accident,* were normal in every respect as regards maneuverability. At the time of the accident in 1947 the left shoulder sustained no appreciable injury and therefore no X ray was taken of it until 1949 *and then minimal osteoporosis was shown to be present.* There was medical testimony to the effect that, although osteoporosis can occur in only one shoulder, it usually appears in both. If we bear in mind that osteoporosis is normally bilateral, it becomes clear that the jury could reasonably infer that it was present in both shoulders at the time of the accident. It progressed only in the right shoulder, which had been injured, and not in the left. The justifiable inference is that the osteoporosis progressed only in the right shoulder and arm *because only that side was immobilized by the injuries.* As a corollary thereto it follows that the left shoulder and arm have remained normal because the plaintiff since the accident has relied upon the use of that arm in assisting with the performance of her personal needs, such as feeding herself and, as a consequence, the inactivity which aggravates the disease has not been present with regard to that limb. Thus, the condition of the left arm would justify a jury finding that the plaintiff would be of normal health, and as active a person

today as she was prior to the accident, if there had been no accidental injuries to cause pain and the resulting inactivity. It is elementary that, in determining whether a verdict is sustained as to the nature and cause of certain injuries, a conflict in the opinions of expert witnesses, like other conflicts in evidence, are to be resolved by the jury. Upon the conflicting evidence herein we must hold that the jury could reasonably find that the aggravation of her disease by defendant's negligence accounts entirely for the disability which she now sustains and will sustain for the rest of her normal life.

When we bear in mind that plaintiff's present and future disability is solely the proximate result of the defendant's negligence, we cannot say that the verdict is excessive. The evidence indicates that plaintiff needs nursing service 24 hours a day. We will assume, however, as the jury apparently found, that nursing services are required for only eight hours of each day. According to the testimony the reasonable charge for nursing services of the character needed is one dollar an hour or eight dollars per day or $2,920 a year. The present value of a life annuity of $2,920 for a 71-year-old woman is $16,627.06. To this must be added $4,120 as the cost of a nurse from March 1950, when plaintiff became bedridden, until her 71st birthday. The only other item of damage proved is an $82 doctor bill. These items in the aggregate total $20,829.06, and thus the verdict for $26,544.50 includes an award for pain and suffering of $5,715.44. The evidence is that plaintiff has had a great deal of pain and suffering since the accident and that such pain and suffering will continue. Under the circumstances the evidence is more than sufficient to sustain the verdict.

In view of defendant's admitted liability and in view of our conclusion that the verdict is not excessive, the contention that the verdict was motivated by passion and prejudice is moot. Clearly the trial court did not abuse its discretion in denying a new trial on the grounds of passion and prejudice engendered by the arguments of plaintiff's counsel. It is to be borne in mind that a new trial for the misconduct of counsel is never granted as a disciplinary

measure but only to prevent a miscarriage of justice.[3] We do not, however, condone the use of arguments which are not justified by the evidence. Illustrations to illuminate a jury argument may be drawn from everyday life or from the Bible as was done in this case, but such illustrations must not be so used that they themselves, separate and apart from the actual evidence, become vehicles for casting opprobrium upon the opposing party and his witnesses.

The order of the trial court is affirmed.

Affirmed.

[3]Harris v. Breezy Point Lodge, Inc. 238 Minn. 322, 56 N. W. (2d) 655; Moose v. Vesey, 225 Minn. 64, 29 N. W. (2d) 649.