DONALD COX v. CHICAGO, ROCK ISLAND &
PACIFIC RAILROAD COMPANY.

84 N. W. (2d) 263.

July 5, 1957—No. 37,081.

*Sullivan, Stringer, Donnelly & Sharood,* for appellant.
*Dygert & Riordan* and *John P. Whitesell,* for respondent.

DELL, CHIEF JUSTICE.

This is an action for damages for personal injuries sustained by the plaintiff when the door of a boxcar fell upon him. A verdict was rendered in favor of the plaintiff in the sum of $75,000. Defendant appeals from an order denying its alternative motion for judgment notwithstanding the verdict or a new trial.

The accident occurred on April 8, 1954, in Iowa Falls, Iowa, when the plaintiff and a fellow employee, Floyd Ingebritson, were opening the door of a boxcar on the premises of the Ralston Purina Company, plaintiff's employer and consignee of the shipment. The boxcar was owned by the defendant railroad and had been cleaned and inspected by it on March 24, 1954, at Inver Grove, Minnesota. Since the shipper was located on Great Northern trackage, the car was then delivered to the Great Northern Railway at Minneapolis. The car was inspected by the Great Northern, loaded with corn at the St. Anthony Elevator in Minneapolis, and on April 1 delivered to the defendant railroad. It arrived at Iowa Falls on April 4 and was switched over to the Ralston plant on April 7-8. The shipment was made on the defendant's bill of lading, which designated the defendant as the originating as well as delivering carrier.

While none of the inspectors could remember this particular boxcar, the records show that it was inspected at the times indicated. When a boxcar is empty, the inspections made by the defendant railroad consist of two men walking on the ground on either side of the car. The door is manipulated to see that it opens or closes satisfactorily. If the door sticks, unless caused by some foreign object readily removable, it is labeled "bad order" and the car is sent to the repair tracks for necessary repairs. When a boxcar is loaded the door inspection merely consists of seeing that the doors are properly locked and sealed. No mechanical defect was noted as to the particular boxcar here involved when in-

spected at Inver Grove on March 24 by the defendant's inspectors, nor when similarly inspected in Minneapolis by the Great Northern on March 25. Inspections made after the car was loaded were limited to checking seals and air brakes.

The door of the boxcar is a sheet of steel, 9 feet 4-3/4 inches high and 6 feet wide, which slides to the right along the side of the car. The bottom of the door rests upon a horizontal rail which is attached to the side of the car. At the bottom of the door are two metal rollers which normally raise the door about one-half inch above the lower rail and make it easier to move. The door is kept on the lower rail by two hook-like door hangers which go from the door over and outside the lower rail, under it, and up behind it. Along the entire length of the top of the car is a heavy "side plate." To this is attached a "Z" bar which retains the top of the door against the car. The "Z" bar normally overlaps the top of the door about 1-5/16 inches. The mechanism of the door is more clearly shown by the photographs in evidence but the above description will suffice for the purposes of this opinion.

According to the plaintiff, on the morning of the accident the seal on the door of the boxcar was removed and he and Ingebritson pushed the door to the right. After the door had moved about 18 inches, it started to move harder and then fell upon the plaintiff. Ingebritson, the only other witness to the accident, gave a somewhat different version. He testified that he was unable to move the door and got a 2 x 4 to pry it open. After it had opened about 4 to 6 inches, he manually pushed it about halfway open. The door stuck again and he used the 2 x 4 to pry it open further. The door then came off at the top and fell on the plaintiff.

Inspection of the door mechanism after the accident revealed that the rollers holding the door off the bottom rail were worn. Instead of holding the door one-half inch off the bottom rail, they held it up only about one-eighth of an inch which would, of course, cause a corresponding reduction in the area of the door retained by the "Z" bar. The "Z" bar at the top of the door and the side plate against which it was fastened were bent out and up. There is considerable controversy as to the length of the distortion of the "Z" bar, which was most pronounced at the center of the door opening. According to the plaintiff, the photo-

graphs and testimony show that it extended the entire length of the door, while the defendant claims that it was only a slight wave extending considerably less than the length of the door.

■  A delivering carrier by rail owes a duty to employees of the consignee who unload the car of exercising reasonable care to ascertain whether the car is reasonably safe for the purpose of unloading.[1] If a dangerous condition exists which can be discovered in the course of a reasonable inspection, the delivering carrier is under a duty to repair or give warning of such defect. An originating carrier is under a similar obligation to furnish a reasonably safe car.[2]

As we understand its argument, the defendant, who was the delivering carrier as well as the original supplier of the boxcar, does not challenge the above statement of its duty of care. In any event, the instructions of the trial court, which charged the jury to this same effect, were not questioned below and hence became the law of the case.[3] The defendant does contend, however: (a) That there was no proof of any defects in the door apparatus of the boxcar prior to the happening of the accident and while the car was in its possession; (b) that even if the defects were in existence prior to the accident, they were not discoverable by reasonable inspection; and (c) that there was no proof that the defects, if they did exist and were or should have been known to the defendant, were the proximate cause of plaintiff's injuries.[4]

(a)  Relying on the general rule that proof of the existence of a condition at one time does not necessarily prove its existence at an earlier time,[5] the defendant argues that there was no proof of the existence of the alleged defects prior to their actual discovery following the accident. At least two witnesses testified that the distorted "Z" bar was rusty, and

[1]The authorities are collected in Yandell v. National Fireproofing Corp. 239 N. C. 1, 6 to 7, 79 S. E. (2d) 223, 226 to 227. See, also, Bachmann v. Chicago, M. St. P. & P. R. Co. 266 Wis. 466, 63 N. W. (2d) 824.

[2]Yandell v. National Fireproofing Corp. *supra*.

[3]Nelson v. Twin City Motor Bus Co. 239 Minn. 276, 58 N. W. (2d) 561.

[4]The doctrine of res ipsa loquitur concededly does not apply in this case.

[5]Plaintiff cites Erickson v. Northern Minnesota Nat. Bank, 235 Minn. 232, 50 N. W. (2d) 489, where we held that the trial court did not abuse its discretion in excluding evidence of an examination of an allegedly defective door made six months after the accident; and Messner v. Red Owl Stores,

did not contain recent marks or scratches. The wear in the rollers at the bottom of the door obviously must have taken place over a relatively long period of time. While the rule relied upon by the defendant is a meritorious one, it must be applied circumspectly. Under the circumstances of this case we believe it manifestly reasonable for a jury to conclude, from the condition of the door apparatus immediately after the accident, that the defects had occurred some time prior thereto.[6]

(b) The defendant's inspection of the car door prior to the delivery of the car to the shipper consisted primarily of determining whether it would open or close, depending upon its position at the time of the inspection. Worn rollers, under defendant's evidence, are not cause for a "bad order" unless they impair the movement of the door, and normally they are not even checked. Defective "Z" bars are not reported unless, according to one inspector, "it was a tremendous bend where possibly the whole thing was ripped off or something." Defendant claims that after the car was loaded it was prohibited by statute[7] from breaking the seals on the door for the purpose of inspection. While we doubt that the statutes relied upon by the defendant are susceptible of this construction, it is immaterial since there was substantial evidence that the defect in the "Z" bar was as readily observable from the outside of the car as from the inside, if not more so.[8]

Whether the inspection or lack thereof by the defendant prior to the loading of the car and again prior to the delivery to the plaintiff's employer was a reasonable one is, in our opinion, a disputable question of fact. The evidence does not justify our interference with the determination of the jury in this respect.

---

Inc. 238 Minn. 411, 57 N. W. (2d) 659, where we held that the existence of a "shriveled up and dark brown" banana peel on a floor did not, in itself, indicate that it was on the floor long enough to put the defendant on constructive notice.

[6]See, e. g., Lewis v. Southern Pac. Co. 98 Cal. App. (2d) 358, 361, 220 P. (2d) 431, 433; Brehmer v. Chicago & N. W. Ry. Co. 269 Wis. 383, 386, 69 N. W. (2d) 565, 566.

[7]See, M. S. A. 235.11, 235.12; 54 Iowa Code Ann. § 708.11.

[8]Compare Ambrose v. Western Maryland Ry. Co. 368 Pa. 1, 81 A. (2d) 895, where the defect was held not to be ascertainable by reasonable inspection.

(c) Even assuming the defects to have existed prior to the accident and to have been discoverable by the defendant on reasonable inspection, it is, nevertheless, argued that they were not the proximate cause of the plaintiff's injuries. His contention is based first on the assertion that there is no evidence tending to show that the door fell off because of the alleged defects. The evidence is clear that the use of the 2 x 4 by Ingebritson could not, in itself, have forced the door off. Defendant suggests that what really happened was that the two men fastened a chain on the left edge of the door in order to force it open and that, in doing so, an enormous pressure was applied which bent the "Z" bar up and out, causing the door to fall. Steel chains or steel bars are sometimes used at the Ralston plant to open car doors that do not readily move. However, in the instant case both men denied the use of such devices and none was found at the scene after the accident. Defendant's suggestion is unsupported by any proof and is, at best, wholly speculative and conjectural. Indeed, it is difficult to understand defendant's contention in light of the testimony of its own witness, Orville Anderson, an inspector for the Great Northern, who testified on cross-examination as follows:

"Q. Were the door closed and it had that bend in the bar on the top, would you be fearful of that door falling off on you when you went to open it?

"A. I don't know how long that bend is sticking out.

"Q. Well, maybe we can help you in that respect. Do you want to step down here, Mr. Anderson? Put that straight edge along there, if you will.

"Supposing it had that much of a bend in it, as shown on Plaintiff's Exhibit N, when we put a straight edge along that bar—

"A. It was bent from here to here? (Indicating)

"Q. Yes.

"A. That door might fall off."

The length of the bend in the "Z" bar referred to by the witness was clarified on redirect and re-cross as follows:

"Q. [Redirect] Mr. Anderson, you were telling us about when a door might fall out because the 'Z' bar was bent up. Now, over what

length longitudinally of a car would it be necessary that the 'Z' bar be bent up in order that the door might come off?

"A.   The whole length of that door, or maybe not quite, but just about.

\* \* \* \* \*

"Q.   [Re-cross] Just one more thing. You have taken the straight edge and you have determined the length or space of that bend?

"A.   That bend is almost the whole length of that door."

This testimony, in itself, is sufficient to support a finding that the bend in the "Z" bar, either alone or in conjunction with the worn rollers, caused the door to fall off.

Similarly, we find little merit in defendant's argument that the conduct of the Great Northern Railway and the St. Anthony Elevator Company constituted intervening causes relieving the defendant of liability. In the first place, we seriously question whether, under the circumstances of this case, the failure of the shipper to make adequate inspection relieved the owner and supplier of the boxcar from liability for its failure to exercise due care to supply a reasonably safe car.[9] Secondly, the defendant, as delivering carrier, was under an obligation to inspect the car for dangerous defects after receiving it from the shipper. As previously discussed, the fact that the car, once loaded, was under seal, did not excuse the defendant from making a reasonably adequate inspection.

We must conclude that the evidence amply supports the jury's finding of the defendant's liability.

■   The plaintiff was awarded damages in the amount of $75,000. He suffered a dislocated and fractured shoulder and a pelvic fracture. For five weeks he was in a heavy plaster cast covering the trunk of his body and both legs, including the knees. During his hospital confinement, which lasted for 71 days, plaintiff lost considerable weight and developed various complications. Shortly after being placed in the

---

[9]Compare Peneff v. Duluth, M. & N. Ry. Co. 164 Minn. 6, 204 N. W. 524, where we held that the mere placing of a car on an industry track for loading does not absolve the owning line from its duty of adequate inspection. See, also, Yandell v. National Fireproofing Corp. 239 N. C. 1, 79 S. E. (2d) 223.

cast he had an attack of pulmonary embolism and later developed thrombophlebitis in both legs. He endured considerable pain during and after his confinement.

The evidence substantiates a 20-percent loss of the function of the plaintiff's left arm, and a 10-percent loss of function of his back. He is, however, able to continue work but is engaged, and must so continue, in a less strenuous job at a slightly lower wage rate and will not be able to put in as much overtime work as in the past. Because of disturbances in the circulatory or venous system of his legs brought on by the accident, he will have to wear elastic bandages on his legs and have periodic medical examination for his post thrombophlebitis condition. It is likely that plaintiff will submit to an operation on the veins of his legs which will hospitalize him for about three weeks.

Defendant contends that, at the maximum, plaintiff's past and future pecuniary loss cannot exceed $24,000. Plaintiff, on the other hand, submits that the total pecuniary loss, past and future, is approximately $38,900. We must agree with the defendant that the plaintiff, in his calculations, has automatically multiplied past losses by his life expectancy often without the benefit of sufficient evidence to substantiate the projection of such losses into the indefinite future. However, even accepting plaintiff's version of his pecuniary loss, nearly half of the verdict can be attributed only to damages for pain and suffering. The plaintiff, undoubtedly, did endure considerable pain and it is reasonable to expect that he will suffer considerably in the future. Nevertheless, we find that the award for pain and suffering, which was at least $35,000, and under the defendant's version, over $50,000, to be grossly excessive.

The case appears to have been fairly tried by both sides in a lawyer-like manner and there is nothing in the record to indicate the existence of either passion or prejudice and we find none. The excessive verdict was, undoubtedly, due to the unwitting acceptance of figures submitted by the plaintiff pertaining to the elements of damage without realizing that they were based upon an inadequate or improper factual foundation.

In Knox v. City of Granite Falls, 245 Minn. 11, 20, 72 N. W. (2d) 67, 74, we stated:

"* * * Notwithstanding the absence of passion or prejudice, trial

courts should not hesitate to take appropriate action where the evidence does not justify the amount of a verdict, * * *."

In Ahlstrom v. Minneapolis, St. P. & S. S. M. R. Co. 244 Minn. 1, 26, 27, 68 N. W. (2d) 873, 889, we pointed out that, under the ineffective legal generalities which supposedly delineate the area of appellate review of damages, "plaintiffs in recent years have successfully resisted appellate attack on increasingly large personal injury verdicts" and stated that "by lack of a definite standard we do not forfeit our recourse to common sense and social practicality in given cases"; also that "judicial care must be exercised lest a fatal financial burden" be imposed out of sympathy for the plaintiff. The considerations involved in reviewing the amount of verdicts in cases such as these are set out in detail in Hallada v. G. N. Ry. 244 Minn. 81, 94 to 100, 69 N. W. (2d) 673, 684 to 688, and no useful purpose would be served in reiterating them here. As we said in that case, however (244 Minn. 99, 69 N. W. [2d] 687):

"* * * Whatever process is adopted in fixing an injured person's damages, the reasonableness of the lump sum awarded by the jury must, in the last analysis, also be tested from the unitary standpoint of what total financial benefits that lump sum will confer upon the injured person as a means of making him financially *whole*. No award can be sustained unless it stands the test of reasonableness in the light of its overall effect."

The amount of the verdict here, if conservatively invested, would yield interest approximating plaintiff's preinjury earnings from his regular employment. In addition, the plaintiff's preinjury earning capacity has been only partially reduced by virtue of his injuries. The verdict clearly goes far beyond that required to make the plaintiff "whole." In this situation the duty of the trial court was clear. Either it should have granted the defendant a new trial on all issues or the issue of damages alone so as to permit another jury to pass upon the case or it should have granted a new trial on all issues or the issue of damages alone unless the plaintiff consented that the verdict be reduced to an amount reasonably sustained by the evidence. Unless trial courts carefully scrutinize verdicts and properly exercise their discretion to make cer-

tain that justice is done, appeals and reversals are bound to occur.

We are constrained to conclude that a new trial must be granted limited to the issue of damages only unless, within ten days after the filing of the remittitur in the court below, the plaintiff shall file a written consent that the verdict be reduced to $52,000, interest being allowed thereon from the date the verdict was originally entered. In the event of compliance with such condition, the order appealed from shall be and is affirmed.

Reversed on condition.