DONALD BALDWIN v. CHICAGO AND
NORTHWESTERN RAILWAY COMPANY.

171 N. W. (2d) 89.

September 26, 1969—No. 41314.

16

*Frundt & Hibbs* and *J. H. Frundt*, for appellant.

*Stringer, Donnelly & Sharood* and *Charles A. Flinn*, for respondent.

Heard before Knutson, C. J., and Nelson, Murphy, Otis, and Frank T. Gallagher, JJ.

NELSON, JUSTICE.

Appeal from a judgment in an action for damages resulting from the alleged negligent operation of a switch engine owned by defendant, Chicago and Northwestern Railway Company, which collided with a semi-tractor and trailer owned and operated by plaintiff, Donald Baldwin, of Rake, Iowa. Judgment was entered pursuant to a jury verdict in favor of defendant and plaintiff seeks judgment notwithstanding the verdict or a new trial.

If all conflicts in the evidence are resolved in favor of the prevailing party below, the relevant facts appear to be as follows: About dusk on July 26, 1965, plaintiff was driving his semi-tractor and trailer in an easterly direction approaching a "Y" intersection and railroad crossing in the city of Waseca. At or about the same time, Andrew G. Phelps of Waseca was the

engineer on a Chicago and Northwestern Railway switch engine, which he was operating in a northerly direction from sidetrack No. 3 onto a main track just before the intersection. He was riding on the fireman's side of the cab, which is the left side of the engine. At that time the fireman was on the engineer's side. Phelps had been an employee on defendant's road for 47 years.

The intersection where the accident occurred was where Third Street and Fifth Street joined at the "V" of a "Y" just before the joint street crosses the railroad. The joint street is called Fifth Street and runs generally in an easterly direction. On each side of the track there is a roadway which might be described as an alley. These also lead into the intersection at the crossing.

Phelps testified that he observed plaintiff's truck coming at a rate of speed from 15 to 20 miles per hour 200 to 300 feet away. When he first observed the truck, the train was 100 to 150 feet from the intersection. He stated that he kept his eyes on the truck while he traveled that distance to the intersection, plus the 35 feet to the point of contact; that he saw the truck slow down so much that he assumed the driver would stop. When the truck was 50 feet from the crossing, Phelps still assumed plaintiff was stopping but when plaintiff was 20 feet from the crossing, Phelps, for the first time, decided plaintiff was not going to stop.

Defendant admits that plaintiff's summary of the testimony of Phelps is substantially correct except that Phelps was emphatic that the headlight on the engine was on bright, the engine bell was ringing, and the flashers came on some 3 feet beyond the track bond, which was stipulated to be 35 feet, 2 inches from the center of the crossing. Phelps was positive the signal lights came on because he observed a "peek light" which indicated the signal was operating. He testified that the whistle was not sounded for the reason that he was sure the truck was going to stop.

Charles Mitchell, the flagman, stationed in front of the engine, likewise testified he thought the truck was going to stop and that as a warning he waved his lantern in plaintiff's direction. He had

no means of telling the engineer to sound the whistle. He verified that the engine headlight, which was just above his head, was on and that the bell, which was by his hip, was ringing. Both Phelps and Mitchell stated that the truck hit the train, and this was confirmed by another witness, one James Harter.

Plaintiff testified that he was aware of the existence of flash signals at the crossing. However, he stated that the flashers were not working and that he did not hear any horn or bell or see any train coming. He did testify, however, that he saw the train when it was about 10 feet from him and that both he and the train were, at that time, going about the same speed. In addition, he testified that he was certain no signals were working until after the accident; that he had to contend with a truck approaching the intersection on his right; and that the train was moving between 5 and 10 miles per hour in approaching the crossing. Plaintiff also testified that just prior to the accident he put on his brakes. At that time he was about 2 or 3 feet from the tracks. The "grab irons" of the train, which are used to climb up the side of the engine, caught his semi-tractor and it was pulled sideways and twisted out of shape. The frame was bent, and the windshield "popped out"; and the total loss or damage to the semi-tractor, according to his allegation, in necessary repairs and loss of earnings, was approximately $10,000.

In support of plaintiff's contentions regarding the signal light, James Harter, who was stopped at the crossing across from plaintiff, testified that the signals were not working and that the whistle did not sound and the bell did not ring. He said he saw the train coming from 20 to 30 feet before the crossing and that he particularly looked at the signal lights and they were not on at the time of the collision.

However, in addition to the testimony of Phelps regarding the flasher signals, there was testimony from Ray Schleicher, defendant's signal maintainer. He stated that the signals were tested July 21, 1965, and were operating properly and were tested again July 28, 1965, and operated properly.

That the signals were operating shortly after the accident occurred was verified by Thomas Keane, a Waseca policeman, who investigated the accident 7 to 10 minutes after it occurred and observed them operating properly.

Defendant contends in its brief that plaintiff claimed his view was obstructed by telephone poles and a tree as he approached the crossing, but under cross-examination admitted that the tree was no more than 6 to 8 inches thick and 75 feet from the crossing; that plaintiff acknowledged that beyond that point his vision was clear for 300 or 400 feet down the track and that the tree blocked his view for only 10 or 15 feet.

There was testimony on behalf of the defense by Lee McNally of the Minnesota Public Service Commission who verified that there were no obstructions to the vision of travelers in the quadrant of the crossing with which this action is concerned. He explained that the signal circuit was wired so as not to activate the signals until the train was quite close to the crossing because train movements from spur tracks are made at a slow rate of speed.

1-2. Following return of a verdict in favor of defendant, plaintiff moved for judgment notwithstanding the verdict or for a new trial. This motion was denied by the trial court, which expressed the opinion that the evidence submitted was sufficient to support the jury's verdict.

The assignments of error in plaintiff's brief are: (1) The verdict was not justified by the evidence and is contrary to law; (2) the instruction of the trial court on the extrahazardous rule was so confusing that the jury could not properly understand it or apply it; (3) the court erred in giving its extrahazardous rule to the jury. The latter two assignments were not included in the motion before the court below. Under the circumstances, plaintiff has waived his right to challenge the trial court's instructions in that regard on appeal. However, our view is, after careful reading of the court's charge, that said instructions clearly state the applicable law.

At the close of the instructions, both counsel had been asked whether there were any inadvertent omissions, oversights, or misstatements, and counsel for plaintiff answered, "I have none, your Honor." After the jury had retired to begin its deliberations, counsel for defendant took certain exceptions to the refusal of the court to give requested instructions and to the giving of certain instructions. The court said:

"The exceptions may be noted. Have you got any, * * *?

"[Counsel for plaintiff]: No. I thought the instructions were remarkably good considering the confusion."

Rule 51, Rules of Civil Procedure, provides:

"* * * No party may assign as error unintentional misstatements and verbal errors, or omissions in the charge, unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objections. An error in the instructions with respect to fundamental law or controlling principle may be assigned in a motion for a new trial though it was not otherwise called to the attention of the court."

We held in Coble v. Lacey, 252 Minn. 423, 433, 90 N. W. (2d) 314, 322, that—

"* * * despite errors of fundamental law or controlling principle a trial court's charge to the jury becomes the law of the case and is not subject to attack or review on appeal when such fundamental errors have not been seasonably and adequately called to the attention of the trial court by appropriate objection or exception, or have not, as a minimum requirement, been assigned for the first time as errors in a motion for a new trial."

This court held in Olson v. Penkert, 252 Minn. 334, 90 N. W. (2d) 193, that if no objection is made at trial to an error in the instructions with respect to fundamental law or controlling principle, it must be assigned in the motion for a new trial before it can be presented to the supreme court on appeal. Where no objec-

tion has been made to a charge given by the court and the motion for new trial was insufficient to adequately set forth the fundamental law or controlling principle in which respect the court allegedly erred, the court's charge, even though erroneous, becomes the law of the case, and the rules of law laid in down in the charge are controlling on appeal.

We also held in Cox v. Chicago, R. I. & P. R. Co. 250 Minn. 187, 84 N. W. (2d) 263, that an unchallenged instruction of a trial court becomes the law of the case. See, also, Caballero v. Litchfield Wood-Working Co. 246 Minn. 124, 74 N. W. (2d) 404; Heise v. J. R. Clark Co. 245 Minn. 179, 71 N. W. (2d) 818; Davies v. Land O' Lakes Racing Assn. 244 Minn. 248, 69 N. W. (2d) 642; Zuercher v. Northern Jobbing Co. 243 Minn. 166, 66 N. W. (2d) 892; Nygren v. Minneapolis St. Ry. Co. 241 Minn. 485, 63 N. W. (2d) 560; Trudeau v. Sina Contracting Co. 241 Minn. 79, 62 N. W. (2d) 492; Nelson v. Twin City Motor Bus Co. 239 Minn. 276, 58 N. W. (2d) 561; Wilson v. Home Gas Co. 267 Minn. 162, 125 N. W. (2d) 725.

3. Considering the testimony in the light most favorable to the prevailing party, the question is simply whether the evidence reasonably tends to sustain the verdict. The verdict will not be set aside unless it is manifestly and palpably contrary to the evidence. The conflicts in the evidence are numerous, but however sharp these conflicts may be, they are to be resolved by the jury.

4. Plaintiff's principal argument against the findings of the jury is based upon his claim that the engineer, Phelps, failed to sound the whistle on the locomotive, which is admitted, after deciding that plaintiff was not going to stop his truck. Plaintiff concludes from this that it was defendant's sole negligence that caused the accident and that plaintiff, even if contributorily negligent, may recover. As defendant points out, both the jury and the trial court have heard this argument and rejected it.

We think there is ample evidence to sustain the jury's verdict either on the ground that defendant was not negligent or that plaintiff was contributorily negligent. It is important to bear

in mind that, as the court instructed the jury, a train has the right-of-way at crossings and the train crew may properly assume that a motorist will exercise due care and stop before he gets into a position of danger. In addition, it has repeatedly been held that a fireman or a nonoperating crew member who sees a vehicle approaching a crossing has no duty to notify the engineer operating the train until it becomes apparent that the driver is not going to stop and a collision is imminent. Ohrmann v. Chicago & N. W. Ry. Co. 223 Minn. 580, 27 N. W. (2d) 806; Schroht v. Voll, 245 Minn. 114, 71 N. W. (2d) 843.

Considering all the facts and circumstances, a jury could reasonably conclude that defendant's employees acted with reasonable care in attempting to stop the train. The evidence as a whole would indicate that plaintiff was as familiar with the crossing in question as the train crew since plaintiff admitted in his testimony that he had, over a considerable period of time, gone over that crossing twice daily. The jury could under the court's instructions and the evidence before it find that plaintiff was contributorily negligent in failing to see the train and stop and that such negligence was the sole, proximate cause of the collision.[1]

There is ample evidence in the record to sustain the jury's verdict. The decision of the trial court must accordingly be affirmed.

Affirmed.

---

[1] Minn. St. 169.26 provides in part: "When any person driving a vehicle approaches a railroad grade crossing and a clearly visible electric or mechanical signal device gives warning of the immediate approach of a train, the driver of such vehicle shall stop not less than 10 feet from the nearest track of such railroad and shall not proceed until he can do so safely."

Minn. St. 169.27 provides: "The railroad and warehouse commission is hereby authorized to designate particularly dangerous highway grade crossings of railroads and to order stop signs thereat. When such stop signs are erected the driver of any vehicle shall stop within 50 feet, but not less than ten feet, from the nearest track of such grade crossing, and shall proceed only upon exercising due care."